Nos. 2--00--0339 & 2--00--0392 cons.

______________________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT 

______________________________________________________________________________

In re
 DETENTION OF TERRY HAYES ) Appeal from the Circuit

) Court of De Kalb County.

)

(The People of the State of ) No. 98--MR--004

Illinois, Petitioner, v. Terry )

Hayes, Respondent-Appellee (The ) Honorable

Department of Human Services, ) John W. Countryman,

Movant-Appellant)). ) Judge, Presiding.

______________________________________________________________________________

In re
 DETENTION OF TERRY HAYES ) Appeal from the Circuit

) Court of De Kalb County.

)

) No. 98--MR--004

(The People of the State of ) 

Illinois, Petitioner-Appellee, ) Honorable

v. Terry Hayes, Respondent- ) John W. Countryman,

Appellant). ) Judge, Presiding.

______________________________________________________________________________

PRESIDING JUSTICE HUTCHINSON delivered the opinion of the court:

Following a jury trial, respondent, Terry Hayes, was found to be a sexually violent person.  The trial court subsequently found that respondent was not appropriate for conditional release and ordered him committed to a secure facility.  The commitment order contained a number of directives for the Department of Human Services (the Department) regarding respondent's treatment.  In No. 2--00--0392, respondent appeals, contending  (1) that the Sexually Violent Persons Commitment Act (the Act) (725 ILCS 207/1 
et seq.
 (West 1998)) is unconstitutional; and (2) the State failed to prove beyond a reasonable doubt that he is a sexually violent person.  Respondent does not contend that the trial court erred when it ordered him committed to a secure facility.  In No. 2--00--0339, the Department appeals, contending  (1) the trial court lacked authority to order the Department to retain a private physician or subject the Department to that physician's supervision; (2) the doctrine of sovereign immunity barred the order as an action against the State; (3) constitutional separation of powers precluded a court order directing the manner in which the Department performed executive functions; and (4) the trial court lacked jurisdiction over the Department.  On respondent's motion we have consolidated these two appeals.  In No. 2--00--0392 we affirm.  In No. 2--00--0339 we affirm in part, vacate in part, and remand.  In accordance with the criteria of Supreme Court Rule 23(a) (166 Ill. 2d R. 23(a)) we have elected not to publish those portions of this opinion relevant to respondent's challenge to the sufficiency of the evidence.

BACKGROUND

On January 13, 1998, the State filed a petition alleging that respondent was a sexually violent person.  On January 15, 1998, the trial court found that probable cause existed that respondent was a sexually violent person, ordered the Department to detain him, and set the matter for a jury trial.  The matter was continued several times for reasons unrelated to this appeal.

On February 22, 1999, the trial court commenced a jury trial on the State's petition.

[The following material is nonpublishable under Supreme Court Rule 23.]

Dennis Doren, a psychologist, testified that he is the administrator of the Mendota Mental Health Institute in Madison, Wisconsin.  Doren is licensed by the State of Wisconsin, is a member of the American Psychological Association, and is a clinical member of the Association for Treatment of Sexual Abusers.  Doren examined respondent in June 1998.  Prior to examining respondent, Doren reviewed his records from the Department of Corrections including 18 mental health evaluations.  Doren also reviewed transcripts of respondent's criminal trial.

Doren interviewed respondent about his "social history," respondent's family, educational, employment and criminal background.  Doren also interviewed respondent about his sexual history.  Doren evaluated respondent using several diagnostic tools including, the Rapid Risk Assessment for Sex Offender Recidivism (the RASOR), Minnesota Sex Offender Screening Tool (the Minnesota Scale), and Violence Risk Appraisal Guide (the VRAG).

Doren diagnosed respondent with pedophilia, a sexual attraction to minor children.  Doren based his diagnosis, in part, on a report indicating respondent had engaged in forced oral and anal intercourse with a ten-year-old boy on between 15 and 100 occasions during a two-year period.  Doren also diagnosed respondent with the disorder of sexual sadism, a condition in which an individual is sexually aroused by the infliction of physical pain or psychological humiliation to someone who does not consent.  Doren based the sexual sadism diagnosis on reports that respondent  forced anal intercourse on his victim and then forced oral intercourse.  The reports also alleged that respondent, on one occasion, defecated on his victim's face.  It was also reported that respondent struck his victim with his hand even though force was not required to subdue his victim.  Finally, respondent watched while a second perpetrator assaulted his usual male victim, raped a female victim with his male victim watching, and assaulted his male victim while the female victim watched.  Doren identified additional "softer signs," such as threats of harm, that supported a sexual sadism diagnosis.  Doren further diagnosed respondent with personality disorder, not otherwise specified, antisocial and borderline features.  Doren also diagnosed respondent with alcohol abuse.

Doren testified that respondent's RASOR score indicated a high likelihood of reoffense.  Respondent's Minnesota Scale rating indicated a high likelihood of reoffense.  Doren testified that he scored defendant at a moderately high to high level on VRAG.  Doren testified that the VRAG was statistically useful for predicting sexual offense attacks but was designed as a tool for assessing the risk of violence against people generally.  Doren concluded that respondent represented a substantial probability for recommitting a sexually violent offense in the future.

On cross-examination, Doren testified that he most often testifies on behalf of the State in commitment proceedings and was being paid for his testimony by the State.  Doren also testified that the records he reviewed did not indicate any criminal acts committed by respondent after 1990.  Doren admitted that respondent denied committing the acts upon which Doren based his sexual sadism diagnosis.  Doren also admitted that he based his diagnosis on police reports and trial transcripts but did not interview the victims directly.

Gerald Burgener, a psychologist employed by the Department of Corrections, testified that he was a clinical member of the Association for the Treatment of Sex Abusers.  In 1997 Burgener reviewed respondent's Department of Corrections records and used the Minnesota Scale to evaluate the risk that respondent would commit another act of sexual violence.  Burgener scored respondent relatively high on the Minnesota Scale and determined that a more extensive evaluation was required.

Burgener interviewed respondent on October 14, 1997.  Following the interview, Burgener diagnosed respondent with pedophilia and antisocial personality disorder.  Burgener identified the bases for his diagnosis including defendant's sexual conduct with minors, deceitfulness, a lack of remorse, impulsivity, and a reckless disregard for the safety of self and others.  Burgener opined that it was substantially probable that respondent would commit future acts of sexual violence.  Burgener explained that respondent was likely to commit further acts of sexual violence because he had been sexually abused as a child and had not received adequate emotional support.  Burgener further explained that respondent's impulsive behavior made future offenses more likely and respondent's history of drug and alcohol abuse was a complicating factor that made future offenses even more likely.  Respondent had been given the opportunity to obtain sex offender counseling while in the Department of Corrections, but did not do so.

On cross-examination, Burgener testified that the general recidivism rate among individuals returning to the Department of Corrections was 35%.  Burgener testified that he learned respondent had attended sex offender counseling at the Ben Gordon Treatment Center before being incarcerated, but admitted that he did not review the records of that treatment.  Burgener admitted that during the interview respondent denied sexually assaulting either the ten-year-old victim or the five-year-old victim.  Burgener testified that his diagnosis did not include sexual sadism.  However, Burgener further testified that if he had reviewed the  same documents as Doren, he would have reached the same diagnosis. 

On further cross-examination, Burgener admitted that the mental health records he reviewed contained neither a diagnosis of pedophilia or sexual sadism.  Burgener testified that the records included only a diagnosis of Dysthymia, a mood disorder related to depression.  Burgener admitted that depression was not a congenital or acquired condition that would predispose a person to sexual violence.  Burgener testified that the records also contained a diagnosis of substance abuse.  Burgener admitted that substance abuse does not predispose a person to sexual violence but testified that it is a complicating factor.

On further cross-examination, Burgener admitted that his report did not use the phrase "substantially probable" and testified that he used the phrase "strong potential."  Burgener testified that he was not aware of a definition of the term "substantially probable."  Burgener further testified that he understood "substantially probable" to mean "considerably more likely than not" and used that standard in formulating his opinion.

The State rested and the trial court denied respondent's motion for a directed verdict.

Respondent testified on his own behalf that he had resided at the Sheridan Correctional Center since January 15, 1998.  Prior to that time he had been held in a Department of Corrections facility for five years.  Immediately prior to his detention in the Sheridan facility, he had been released for a period of time.  In 1991, respondent pleaded guilty to an offense that occurred in 1990 involving a five-year-old boy.  Respondent was incarcerated for six months and was released in June 1991.  Respondent was arrested on a charge involving a ten-year-old boy in April 1993.  Respondent participated in sex offender counseling at the Ben Gordon Center in De Kalb during the period between his release and his second arrest.  Respondent further testified that he was committed to a juvenile facility in 1988 for possession of a stolen vehicle and remained there through 1989.

Respondent lived in Sandwich, Illinois in 1988 and knew the ten-year-old boy Doren referred to in his testimony.  Respondent testified that the reports provided to Doren were inaccurate.  Respondent denied having sexual contact with the boy, denied physically abusing the boy and denied forcing the boy to watch him engage in sexual contact with another individual.  In 1993, respondent was charged and tried in connection with the alleged sexual contact with the boy.  Respondent was found guilty and sentenced to 30 years' incarceration.  Respondent's conviction was subsequently overturned and his case remanded for a new trial.  Respondent pleaded guilty in exchange for a 10-year sentence.  Respondent denied committing the offense but explained that he pleaded guilty after his attorney advised him that if he went to trial he would likely be convicted again and receive another 30-year sentence.  Respondent anticipated actually serving less than five years incarceration and had already served three and one-half years of the sentence.  Respondent remained in the department of corrections from 1993 through 1997.

Respondent testified that while he was incarcerated no one recommended that he obtain sexual offender counseling.  Respondent met with mental health professionals in the Department of Corrections because he suffered from nightmares and insomnia.  Respondent was prescribed a variety of medications and returned to his unit.  Respondent was currently receiving Paxil for the treatment of depression, Klonopin for nightmares, and other medications to treat Crohn's disease.

Respondent testified that he believed that he required mental health treatment for depression.  Respondent did not believe that a substantial probability existed that he would commit further sexually violent offenses.  If given the option, respondent would seek inpatient mental health services at a local hospital.

Respondent further testified that he acknowledged committing a criminal sexual act against the five-year-old.  Respondent did not believe that the child was at fault and believed he was at fault.  Respondent testified that he never denied committing a sex act on the five-year-old victim when speaking with a health professional.

On cross-examination, respondent admitted that he believed he needed to be institutionalized for treatment of depression.  Respondent testified that he fondled the penis of the five-year-old boy.  Respondent was dating the boy's mother at the time.  Respondent denied being sexually aroused by the incident and testified that he was drunk and high at the time and did not know why he committed the act.  Respondent denied sexually assaulting the ten-year-old victim.

On further cross-examination, respondent admitted that he was sentenced to probation for the offense committed against the five-year-old.  Respondent admitted one of the terms of his probation was to receive counseling.  Respondent testified that after four months he stopped counseling and moved to Nebraska.  Respondent testified that he did not receive counseling in Nebraska.  Respondent admitted that he did not seek approval from his probation officer or the trial court before stopping counseling and moving out of the state.  Respondent admitted fantasizing about fondling the five-year-old during the summer of 1998.

Outside the presence of the jury, the trial court asked defense counsel whether he intended to call an expert witness.  Defense counsel indicated that although the expert was present in the courtroom, he had elected not to call him as a witness.  The trial court questioned respondent regarding the decision.  Respondent acknowledged that the court had provided him with an expert, but stated that he agreed with the decision not to call the witness.  Defense counsel rested and renewed his motion for a directed verdict.  The trial court denied the motion.

[The preceding material is nonpublishable under Supreme Court Rule 23.]

The jury found that respondent was a sexually violent person.  The trial court entered judgment on the jury's verdict, ordered respondent committed to the Department, ordered a supplemental mental examination, and continued the matter for status.  The matter was continued several more times for reasons unrelated to this appeal.

On January 4, 2000, the trial court conducted a dispositional hearing.  Carl Wahlstrom, a psychiatrist, testified on behalf of the State.  Wahlstrom reviewed a variety of written reports and examined respondent on September 14, 1999.  Following the examination Wahlstrom reached a medical diagnosis of Crohn's disease, a chronic bowel inflammatory disease.  Wahlstrom recommended that respondent's medical condition be monitored by a medical doctor, an internist, and that he be referred to a gastroenterologist if the disease did not remain in remission.

Wahlstrom further testified that he made a diagnosis of respondent's mental condition.  Wahlstrom's diagnoses included major depression with psychotic features; alcohol, marijuana, and cocaine dependence; a severe, childhood-onset type of conduct disorder that had evolved into an antisocial personality disorder; and pedophilia.  Wahlstrom formulated a treatment plan based on his diagnoses of respondent.

Wahlstrom testified that he believed respondent's depression required more aggressive treatment.  He recommended that the antidepressant he was receiving be replaced with a different type of antidepressant and that an antipsychotic medication be added.  Wahlstrom also recommended testing respondent to determine whether a thyroid disorder was contributing to his depression.  Wahlstrom recommended that respondent's chemical dependence be treated with a treatment program incorporating elements of the Alcoholics Anonymous and Narcotics Anonymous programs.  Wahlstrom further indicated that medication might be used in conjunction with a treatment program.  Wahlstrom recommended that the antisocial personality disorder be treated in a structured program incorporating firm limit-setting as an element.  For treatment of respondent's pedophilia, Wahlstrom recommended a variety of techniques, including group therapy, arousal control, and cognitive behavioral therapy.

Wahlstrom testified that he had reviewed the Act and was aware that it provided for treatment either in a secure institutional setting or conditional release.  Wahlstrom opined that respondent should be treated in a secure institutional setting.  Wahlstrom further opined that the treatment respondent would receive at the Sheridan treatment facility would be adequate to treat his mental condition.  Wahlstrom believed respondent would receive adequate medical care at the facility but was concerned that he was in obvious pain and recommended that his medical condition be more fully evaluated for pain control.  Wahlstrom opined that respondent would not be able to obtain the necessary treatment outside a secure institutional setting such as the Sheridan treatment center.

In response to questioning by the trial court, Wahlstrom opined that a psychiatrist who is not board certified in forensic psychiatry and did not have a great deal of experience would not be qualified to oversee the treatment plan he had outlined for respondent.  Wahlstrom opined that an experienced psychiatrist should have oversight of the program.

Sadashiv Parwatikar, a psychiatrist, testified that he acts as a forensic consultant under a contract with the State of Illinois.  Parwatikar reviewed respondent's records and interviewed him on September 20, 1998.  Parwatikar diagnosed respondent with paraphilia, polysubstance dependence, antisocial personality, borderline personality, and Crohn's disease.

Parwatikar testified that he formulated a treatment plan for respondent's Crohn's disease.  The plan included treatment with antibiotics and surgical intervention, if required.

Parwatikar further testified that he had formulated a treatment plan for respondent's mental condition.  Parwatikar recommended that respondent's personality and sexual problems be treated in a combined manner.  Parwatikar recommended drug treatment for depression and recommended the sexual problem be treated with group and individual psychotherapy.  Parwatikar opined that respondent should be treated in a structured environment.  Parwatikar testified that he was not fully aware of the treatment available at the Sheridan facility but indicated that it was the type of program he would recommend.

Raymond Wood, clinical director of the sexually violent persons program, testified that his employer, Liberty Health Care, operated the Sheridan facility under a contract with the Department.  The facility used a team approach to treatment, and a treatment team ordinarily included a psychologist, a nurse or psychiatrist, a therapist, a security representative, and, if needed, a substance abuse counselor or recreation therapist.  Wood testified that treatment teams often included additional members.  Woods described a five-phase program used to treat sex offenders.

Timothy Budz, a licensed clinical social worker, testified that he was employed as the facility director at the Sheridan facility.  Budz testified that he was in charge of day-to-day operations at the facility.  Budz supervised Wood and his staff but was not directly involved with the treatment of individuals.  Budz described the physical layout of the Sheridan facility and the Department's plans to remodel a Department of Corrections facility in Joliet and relocate the program.

Hollida Wakefield, a psychologist, testified on behalf of respondent.  Wakefield examined respondent on November 4, 1999.  Wakefield used a variety of techniques to analyze respondent's risk level.  Wakefield diagnosed respondent with polysubstance abuse, depressive disorder, antisocial personality disorder, and borderline personality disorder.  Wakefield concluded that respondent presented a moderate to high risk of recidivism.  After assessing respondent, Wakefield collaborated with Ralph Underwager to develop a treatment plan.

Ralph Underwager, a psychologist, testified that he collaborated with Wakefield to develop a treatment plan for respondent.  Wakefield believed that respondent presented a situation of comorbidity, the presence of more than one mental illness, that was fundamental in developing a treatment plan.  Underwager opined that respondent would not likely respond to sex offender treatment until his antecedent conditions were treated.  After the other conditions were treated, respondent would be able to be effectively involved in a sex offender treatment program.  Underwager concluded that respondent could not be effectively treated at the Sheridan facility.  Underwager recommended treatment in a secure general psychiatric facility, such as the Elgin Mental Health facility.

Respondent testified on his own behalf.  Respondent testified that he had been prescribed medication to treat his Crohn's disease but that he was not currently receiving the medication.  Respondent had spoken with nurses at the Sheridan facility but had been unable to learn why he was not receiving the medication.  Respondent testified that he believed the treatment plans proposed by Underwager and Wahlstrom would benefit him but he did not believe he would receive the proposed treatment from the Department.

Following argument, the trial court ordered that respondent be committed to a secure facility for treatment and adopted the findings of Wahlstrom's report.  The written commitment order provided in pertinent part:

"1.  That [respondent] is hereby committed pursuant to 725 ILCS 207/40 for institutional care in the Sheridan facility for Sexually Violent Persons or, once it is completed, the Joliet facility for Sexually Violent Persons.

2.  That as an integral part of this commitment order, the Department of Human Services is to arrange for the control, care and treatment of [respondent] in accordance with the plan of treatment presented in Dr. Carl M. Wahlstrom's report ***.

3.  That the Court has adopted the findings of Dr. Wahlstrom in his report as its own findings.

4.  That in addition, the Department of Human Services shall employ Dr. Wahlstrom to oversee the execution of said plan.

5.  That the Department of Human Services shall authorize Dr. Wahlstrom to consult with any medical provider or psychologist he believes is necessary for the treatment required to implement said plan.

6.  That Dr. Wahlstrom shall provide this Court with a written report of the staffing and treatment involving the Respondent.  ***

7.  That the staffing referred herein shall include consultation with the Respondent's internist for his Crohn's Disease, since it is the Court's finding that the current treatment of Respondent requires that his physical and mental illness by [
sic
] treated concurrently.

8.  That the Department of Human Services shall authorize and pay Dr. Wahlstrom to supervise and direct all of the treatment provided to respondent.  ***  The Department of Human Services shall comply with all orders of Dr. Wahlstrom including providing the Respondent with all medications prescribed by Dr. Wahlstrom and/or the Respondent's internist."

On February 16, 2000, respondent filed a notice of appeal from the trial court's order of February 24, 1999, finding him a sexually violent person and its order of January 28, 2000, committing him to a secure facility.

On February 28, 2000, the Department filed a motion to vacate, modify, dissolve, and/or reconsider the trial court's January 2000 commitment order.  The motion alleged, 
inter alia
, the order exceeded the trial court's statutory authority, the order was overly broad, the order improperly required the employment of Dr. Wahlstrom, the order violates the separation of powers clause, and the trial court lacked jurisdiction over the Department.

On March 2, 2000, the Department filed a special and limited appearance and a motion to stay enforcement of the January 2000 commitment order.  On March 6, 2000, counsel for the Department appeared before the trial court.  The trial court refused to hear argument on the Department's motion because the Department had not filed a general appearance in the case.  In response the Department agreed to file a general appearance.  The trial court denied the Department's motion to stay the January 2000 order, but clarified the order, holding that it applied only to the treatment of respondent and that the Department was not required to treat Dr. Wahlstrom as an employee.  The trial court continued the matter for hearing on the Department's motion to vacate.

On March 21, 2000, the trial court conducted a hearing on the Department's motion.  The trial court denied the motion, explaining that it recognized the limits imposed by the doctrine of separation of powers but that it did not believe its order interfered with the day-to-day operations of the Department.  The Department timely appeals the trial court's order denying its motion to vacate the January 2000 order.

ANALYSIS

No. 2--00--0392

Constitutionality of the Act

Respondent first contends that the Act is unconstitutional on it face.  Respondent argues that the Act's definition of "sexually violent person" violates the guarantees of substantive due process because the use of the phrase "substantially probable" in the Act creates a lower standard than the "likely" standard approved by the United States Supreme Court in 
Kansas v. Hendricks
, 521 U.S. 346, 138 L. Ed. 2d 501, 117 S. Ct. 2072 (1997).  The State responds that the "substantially probable" language creates a higher standard than the one approved in 
Hendricks
.  A challenge to the constitutionality of a statute is a matter of law that we review 
de novo
.  
In re Detention of Samuelson
, 189 Ill. 2d 548, 558 (2000).

The Act allows the State to extend the incarceration of criminal defendants beyond the time they would otherwise be entitled to release if they are found to be "sexually violent persons."  
Samuelson
, 189 Ill. 2d at 552.  The Act defines a "sexually violent person" as:

"a person who has been convicted of a sexually violent offense, has been adjudicated delinquent for a sexually violent offense, or has been found not guilty of a sexually violent offense by reason of insanity and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence."  725 ILCS 207/5(f) (West 1998).

In 
Hendricks
, the United States Supreme Court examined a similar commitment statute in Kansas that allowed civil commitment of individuals who were "likely" to engage in acts of sexual violence.  
Hendricks
, 521 U.S. at 357, 138 L. Ed. 2d at 512, 117 S. Ct. at 2080.  The Supreme Court upheld the statute against a due process challenge, observing that it "cannot be said that the involuntary civil confinement of a limited subclass of dangerous persons is contrary to our understanding of ordered liberty."  
Hendricks
, 521 U.S. at 357, 138 L. Ed. 2d at 512, 117 S. Ct. at 2080.  A mere predisposition to violence is insufficient; rather, civil commitment is appropriate when there exists "evidence of past sexually violent behavior and a present mental condition that creates a likelihood of such conduct in the future if the person is not incapacitated."  
Hendricks
, 521 U.S. at 357-58, 138 L. Ed. 2d at 512, 117 S. Ct. at 2080.  The Supreme Court also rejected double jeopardy and 
ex post facto
 challenges to the Kansas statute.   
Hendricks
, 521 U.S. at 371, 138 L. Ed. 2d at 521, 117 S. Ct. at 2086.

In 
Samuelson
, our supreme court reversed a circuit court ruling that the Act was unconstitutional.  
Samuelson
, 189 Ill. 2d at 552.  Respondent acknowledges the 
Samuelson
 ruling but argues that the supreme court left unresolved the issue of whether the "substantially probable" standard of the Act met the minimum requirements for due process identified in 
Hendricks
.  Respondent further argues that the word "probable" in the Act has the same meaning as the word "likely" used in the Kansas statute and that the addition of the word  "substantially" creates a standard below the "likely" standard approved in 
Hendricks
.  We disagree.

We decline to read 
Samuelson
 as narrowly as respondent suggests. 
 The supreme court indicated that it was "reluctant to issue a blanket pronouncement that the 
postcommitment discharge procedures
 present no due process problems."  (Emphasis added.)  
Samuelson
, 189 Ill. 2d at 565.  However, respondent's arguments are addressed solely to the Act's commitment procedures, and we do not view this 
dicta
 as an invitation to reconsider the supreme court's determination that the Act is constitutional.

More importantly, we determine that the Act's "substantially probable" standard does not violate substantive due process.  We appreciate the subtle grammatical distinction between "substantially probable" and "substantial probability" that respondent illuminates in his argument.  However, this is a distinction without difference.  The Act, as do all statutes, carries a strong presumption of constitutionality.  
Samuelson
, 189 Ill. 2d at 558.  The objective of statutory construction is to give effect to the legislature's intent, and when presented with conflicting interpretations courts will avoid a construction that creates constitutional difficulties, absurdity, inconvenience, or injustice.  
People v. Berg
, 277 Ill. App. 3d 549, 552 (1996).

Respondent argues that under 
Hendricks
 a person may be committed as a sexually violent person only if she or he is more likely than not to commit an act of sexual violence in the future.  Recast in mathematical terms, respondent's argument requires a probability of reoffense greater than .5 or 50%.  We do not believe that the Supreme Court identified a mathematical standard when it held that the "likely" standard used in the Kansas legislation complied with due process.  The question of substantial probability under the Act cannot be reduced to mere percentages.  
In re Detention of Walker
, 314 Ill. App. 3d 282, 294 (2000).  Instead, the combination of a "likely" standard with evidence of mental illness complied with due process because the statutory requirements served to "limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control."  
Hendricks
, 521 U.S. at 358, 138 L. Ed. 2d at 513, 117 S. Ct. at 2080.  Similarly, we determine that the definition of "sexually violent person" contained in the Act serves to limit the class of individuals subject to involuntary civil confinement, without defining precisely the level of dangerousness.

However, even if we assume, as respondent argues, that 
Hendricks
 established a minimum threshold of danger to justify commitment, we determine that the Act's definition of sexually violent person meets or exceeds this requirement.  We find persuasive the Wisconsin Supreme Court's interpretation of a similar statute.  See 
In re Commitment of Curiel
, 227 Wis. 2d 389, 597 N.W.2d 697 (1999).  The Wisconsin court held that under commonly accepted usages the phrase "substantially probable" means "much more likely than not."  
Curiel
, 227 Wis. 2d at 406, 597 N.W.2d at 704.  We determine that the phrase "substantially probable" in the Act also means "much more likely than not," a standard higher than or equal to the "likely" standard found constitutional in 
Hendricks
.  However, we emphasize that this definition cannot be reduced to a mere mathematical formula or statistical analysis.  Instead the jury must consider all factors that either increase or decrease the risk of reoffending, and make a commonsense judgment as to whether a respondent falls within the class of individuals who present a danger to society sufficient to outweigh their interest in individual freedom.  See 
Walker
, 314 Ill. App. 3d at 294; see also 
Hendricks
, 521 U.S. at 356-57, 138 L. Ed. 2d at 511-12, 117 S. Ct. at 2079.

Illinois courts have not recognized the distinction between "substantial probability" and "substantially probable" upon which respondent relies.  Instead Illinois courts have used the terms synonymously.  See 
Samuelson
, 189 Ill. 2d at 559; 
Walker
, 314 Ill. App. 3d at 293-94.  The Supreme Court of Wisconsin expressly found the equivalency implicit in the Illinois cases.  See 
Curiel
, 227 Wis. 2d at 402-03, 597 N.W.2d at 703 ("We explicitly note this difference in the phrasing of the term to emphasize that our interpretation of 'substantially probable' serves equally as an interpretation of 'substantial probability' ").  The Act itself also uses both phrases interchangeably.  Compare 725 ILCS 207/5(f) (West 1998) ("he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence") with 725 ILCS 207/15(b)(5) ("the person's mental disorder creates a substantial probability that he or she will engage in acts of sexual violence").

The "substantially probable" standard was recently examined in 
In re Detention of Bailey
, 317 Ill. App. 3d 1072 (2000).  In 
Bailey
, the reviewing court was presented with a certified question asking whether the Act violated substantive due process because the  phrase "substantial probability" was vague.  
Bailey
, 317 Ill. App. 3d at 1081.  As we have, the 
Bailey
 court found the Wisconsin Supreme Court's analysis in 
Curiel
 persuasive.  
Bailey
, 317 Ill. App. 3d at 1086.  The 
Bailey
 court concluded that "substantially probable" is not vague and defined the phrase as "much more likely than not."  
Bailey
, 317 Ill. App. 3d at 1086.  Although the certified question presented to the 
Bailey
 court raised a narrower and distinct challenge to the constitutionality of the Act, we find that the reasoning expressed therein is consistent with, and supportive of, our analysis of respondent's challenge to the Act.  Therefore, we conclude that the "substantially probable" definition used in the Act does not violate due process and is not unconstitutional.

[The following material is nonpublishable under Supreme Court Rule 23.]

Sufficiency of the Evidence

Respondent also contends that the State failed to prove beyond a reasonable doubt that he was a sexually dangerous person.  Although a commitment proceeding is civil in nature (725 ILCS 207/20 (West 1998)), the Act adopts the "beyond a reasonable doubt" burden generally applicable in criminal law (725 ILCS 207/35(d)(1) (West 1998)).  Accordingly, we will review the sufficiency of the evidence with the same standard used to review criminal convictions, 
i.e.
, whether the
 evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the respondent's condition.  See 
People v. Young
, 128 Ill. 2d 1, 51 (1989)
.  "[T]he relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.
"  
People v. Campbell
, 146 Ill. 2d 363, 374 (1992).  The trier of fact bears the responsibility of resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from basic facts to ultimate facts.  
Campbell
 146 Ill. 2d at 375, citing 
Jackson v. Virginia
, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979).

In this case the State was required to prove that (1) respondent had been convicted of a sexually violent offense, (2) respondent had a mental disorder, and (3) respondent was dangerous to others because his mental disorder created a substantial probability that he would engage in acts of sexual violence.  725 ILCS 207/5(f) (West 1998) (definition); see also 725 ILCS 207/15(b) (West 1998) (petition contents).  The parties do not dispute that respondent had been convicted of a sexually violent offense within the meaning of the Act.

The State presented clear unequivocal expert opinion evidence supporting the last two elements.  Doren testified that respondent suffered from pedophilia, sexual sadism, personality disorder, and alcohol abuse, and identified in detail the factors upon which he based his diagnosis.  Doren further testified that each of the diagnostic tools he used to gauge respondent's risk of reoffense indicated a statistically moderately high to high risk of reoffense.  Doren concluded that respondent presented a substantial probability of committing a sexually violent offense in the future.  Burgener testified that he independently employed a similar process to reach the same conclusion.  We note that respondent elected not to present expert testimony to rebut the opinions of the State's experts.

Respondent does not argue that the methods used by the State's experts were faulty or that their testimony was unreliable.  Instead, respondent argues that his testimony was clear, emphatic, and credible.  Respondent further argues that because he admitted a prior crime and sexual fantasies about that victim we should find that these statements against interest enhance the credibility of his testimony.  Respondent concludes that we should accord great weight to his statement that he will not commit another offense in the future.  We are unpersuaded by these arguments.

It was the jury's role to weigh his testimony, and we will not usurp the jury's function.  See 
Campbell
 146 Ill. 2d at 375
.  In making its determination, the jury is not required to accept respondent's version of events but, rather, must consider the probability or improbabilities of his testimony, and the testimony of other witnesses.  See 
People v. Kopczick
, 312 Ill. App. 3d 843, 848 (2000).  In light of the testimony of the State's experts, the jury could have reasonably concluded that respondent's testimony that he would not commit another offense was not credible.  Alternatively, in light of the evidence of a mental illness affecting respondent's volitional control, the jury could have reasonably found that respondent sincerely intended not to commit further acts of sexual violence but that, regardless of the sincerity of his intentions, respondent's mental condition made it impossible for him to control his future conduct.  Therefore, we conclude that the State presented sufficient evidence to prove respondent was a sexually violent person beyond a reasonable doubt.

[The preceding material is nonpublishable under Supreme Court Rule 23.]

No. 2--00--339

The Department challenges the trial court's commitment order on several bases.  We will address first those jurisdictional and constitutional contentions that would be dispositive of this appeal.

Personal Jurisdiction over the Department

The Department contends that the trial court's order was void because it lacked personal jurisdiction over the Department.  We disagree.  Under fundamental principles of due process, a court is without jurisdiction to enter an order or judgment affecting a right or interest of someone not before the court.  
Emalfarb v. Krater
, 266 Ill. App. 3d 243, 247 (1994).  Whether a court had personal jurisdiction is a matter of law that we review 
de novo
.  
Mugavero v. Kenzler
, 317 Ill. App. 3d 162, 164 (2000).

In this case, the issues before the trial court were whether respondent was a sexually violent person and whether he should be committed to a secure facility or conditionally released.  See 725 ILCS 207/35, 40 (West 1998).  Resolution of these issues directly affected only the rights of respondent.  The Department's interests were not affected directly but instead were implicated because the Act imposes a duty on the Department to arrange for the control, care, and treatment of sexually violent persons after they are so adjudicated.  See 725 ILCS 207/40(b)(2) (West 1998).  The trial court's judgment is a binding determination of respondent's rights whether or not the Department is joined as a party.  See 
Emalfarb
, 266 Ill. App. 3d at 249.  Therefore, we conclude that the trial court did not lack jurisdiction to enter a commitment order merely because the Department had not been named as a party or served with process.

We note, however, that the Department does have nonparty standing to appeal the trial court's commitment order if it believes the order exceeds the trial court's authority under the Act.  See 
People v. Szypcio
, 307 Ill. App. 3d 609, 611 (1999) (recognizing the standing of the Secretary of State to appeal an order directing the issuance of a judicial driving permit); 
In re R.V.
, 288 Ill. App. 3d 860, 864-65 (1997) (recognizing the standing of the Department of Children and Family Services (DCFS) to appeal an order requiring DCFS to videotape interviews with children alleging sexual abuse).  We address 
infra
 the issue of whether the trial court's commitment order exceeded its statutory authority.

Sovereign Immunity

The Department also contends that sovereign immunity precluded entry of the trial court's commitment order.  The Department argues that, because the order required the expenditure of State funds, it constituted a suit against the State over which the Court of Claims has exclusive jurisdiction.  See 745 ILCS 5/1 (West 1998).  We disagree.

While sovereign immunity dictates that the State can be sued only in the Court of Claims, the determination of whether an action is, in fact, a suit against the State turns upon the relief sought rather than the formal designation of the parties.  
In re Lawrence M.
, 172 Ill. 2d 523, 527 (1996).  A suit against state officials that seeks to compel them to perform their duty is not a suit against the State even though the duty to be performed arises under a certain statute and the payment of State funds may be compelled.  
Lawrence M.
, 172 Ill. 2d at 527; 
R.V.
, 288 Ill. App. 3d at 867.  In 
Lawrence M.
, the supreme court held that a court order requiring DCFS to provide and pay for in-patient drug treatment was not a suit against the State because the 
trial court believed that the Juvenile Court Act of 1987 (705 ILCS 405/1--1 
et
 
seq.
 (West 1996)) imposed a duty to do so on DCFS.  
Lawrence M
, 172 Ill. 2d at 527.  Similarly, in 
In re Rami M.
, 285 Ill. App. 3d 267 (1996), the reviewing court held that an order requiring DCFS to provide service to a minor and his family was an order compelling DCFS administrators to perform their duty and was not barred by sovereign immunity.  
Rami M.
, 285 Ill. App. 3d at 272.

In this case, neither party directly sued the Department.  The "relief sought" to which the Department objects was the conditions imposed on respondent's commitment by the trial court.  The Act requires the Department to provide for the "control, care and treatment" of respondent.  725 ILCS 207/40 (West 1998).  The trial court's order attempts to direct the manner in which the Department does so.  Whether or not the Act authorizes the trial court to enter such an order, the trial court believed that the Act imposed a duty on the Department to follow the commitment order.  Accordingly, we find that the trial court's order is in the nature of a suit compelling a state official to perform her or his duty and is not barred by sovereign immunity.  See 
R.V.
, 288 Ill. App. 3d at 867.

Separation of Powers

The Department also contends that the trial court's order violates the doctrine of separation of powers because it unduly encroaches on the sphere of authority granted the Department, a division of the executive branch of the government.  The Illinois Constitution provides, "The legislative, executive and judicial branches are separate.  No branch shall exercise powers properly belonging to another."  Ill. Const. 1970, art. II, §1.  However, the doctrine of separation of powers was not designed to achieve a complete divorce among the three branches of government, nor does it require governmental powers to be divided into rigid, mutually exclusive compartments.  
Lawrence M.
, 172 Ill. 2d at 528.  When the legislature creates a statute that contemplates an interplay between the courts and the executive branch, court orders directing the actions of executive agencies do not violate the doctrine of separation of powers.  
Lawrence M.
, 172 Ill. 2d at 529.

In 
Lawrence M.
, the supreme court found that the legislature contemplated an interplay between DCFS and the juvenile court in determining the appropriate services for neglected and abused children and their families.  
Lawrence M.
, 172 Ill. 2d at 529.  The supreme court noted that DCFS was responsible for assisting in the solution of problems that may result in the neglect or abuse of children, and the juvenile court was charged with ordering the provision of services to ameliorate the causes contributing to abuse and neglect.  
Lawrence M.
, 172 Ill. 2d at 528.  The supreme court concluded that, because DCFS and the juvenile court were charged with overlapping responsibilities for abused and neglected children, the evil of the court's usurping the executive discretion was absent in abuse and neglect proceedings.  
Lawrence M.
, 172 Ill. 2d at 528.

We find that a similar interplay between the courts and the Department is contemplated in the Act.  The Act allows the trial court to order the Department to conduct a predisposition investigation or mental examination before entering a dispositional order.  725 ILCS 207/40(b)(1) (West 1998).  If a respondent is found appropriate for conditional release, the Department must prepare a treatment plan for the individual and must submit the plan to the trial court for approval.  725 ILCS 207/40(b)(3) (West 1998).  If a respondent is placed on conditional release, she or he is "subject to the conditions set by the court 
and
 to the rules of the Department."  (Emphasis added.)  725 ILCS 207/40(b)(4) (West 1998).  If a respondent is committed to a secure facility, the Department "shall arrange for control, care and treatment of the person in the least restrictive manner consistent with the requirements of the person 
and in accordance with the court's commitment order
."  (Emphasis added.)  725 ILCS 207/40(b)(2) (West 1998).

In the present case, the jury found that respondent was a sexually violent person.  The trial court conducted a commitment hearing and received testimony regarding respondent's mental and physical condition and the types of treatment respondent needed.  The State's expert, Wahlstrom, testified that the treatment he recommended for respondent could be adequately provided by the Department at the Sheridan facility.  The trial court entered an order that, through reference to Wahlstrom's report, incorporated specific factual findings regarding respondent's mental and physical condition.  The trial court similarly identified the types of treatment respondent required.  We conclude that the legislature clearly intended such an interplay between the courts and the Department in framing a commitment order, and, therefore, the trial court's orders did not violate the separation of powers doctrine.  However, our disposition of this constitutional issue does not resolve the related statutory question of whether the trial court's order exceeded the role envisioned for it by the legislature in this interplay between the judicial and executive branches of government.

Limits of the Trial Court's Statutory Authority

Our resolution of the jurisdictional and constitutional issues leaves unresolved the Department's primary contention that the trial court's commitment order exceeded its statutory authority.  The scope of a trial court's authority to impose conditions on a sexually violent person's commitment is a matter of first impression.  When a court's power to act is controlled by statute, the court is governed by the rules of limited jurisdiction and must proceed within the stricture of the statute.  
In re M.M.
, 156 Ill. 2d 53, 66 (1993).  The legislature is free to enact statutory schemes that create rights and duties that have no counterpart in common law or equity, and it may do so in such a way as to limit the authority of the circuit court.  
M.M.
, 156 Ill. 2d at 65-66.  Whether a trial court's order falls within the authority granted it by the legislature is a question of law that we may review 
de novo
.  See 
R.V.
, 288 Ill. App. 3d at 866.

Generally, a trial court lacks the authority to dictate the manner in which an agency of the executive branch is to carry out its statutory duties.  
R.V.
, 288 Ill. App. 3d at 870.  In 
R.V.
, the reviewing court held that neither the evidentiary provisions of the Juvenile Court Act of 1987 (the Juvenile Court Act) (705 ILCS 405/1–1 
et seq.
 (West 1998)) nor the supreme court rules governing discovery authorized a circuit court to order DCFS to videotape interviews with alleged victims of abuse.  
R.V.
, 288 Ill. App. 3d at 870-71.  Similarly, in 
M.M.
, the supreme court held that, although the Juvenile Court Act authorizes a circuit court to appoint a guardian with the authority to consent to an adoption after the termination of parental rights, the court may not impose conditions on that consent.  
M.M.
, 156 Ill. 2d at 70-71.  The supreme court held that such a conditional order would disrupt the statutory scheme under which the appropriateness of the guardian's consent would be decided in a separate proceeding under the Adoption Act (750 ILCS 50/0.01 
et seq.
 (West 1998)).  
M.M.
, 156 Ill. 2d at 69.  In 
In re Petition of Owen
, 54 Ill. 2d 104 (1973), the supreme court recognized that, absent specific legislative authority in the Juvenile Court Act, a trial court may not prescribe detailed procedures for the treatment and discipline of its wards while committed to the Department of Corrections.  
Owen
, 54 Ill. 2d at 109.  The supreme court observed:

"If the juvenile division of the court in each county in Illinois were to undertake to prescribe specific procedures to be used in treating and disciplining its wards, the divergence of thought among the several courts as to what constitutes correct treatment and discipline of its wards could make it impossible to operate an institution."  
Owen
, 54 Ill. 2d at 109.

With these principles in mind, we will now examine separately the provisions of the trial court's commitment order in light of the authority granted by the Act.

Paragraph 1 of the trial court's order committed respondent to the Sheridan facility or, when completed, the Joliet facility.  The Department does not challenge this portion of the trial court's order.

In paragraph 3 of the commitment order, the trial court adopted the findings contained in Wahlstrom's report as its own.  Although the Department indicates in its brief that it is challenging the provisions of paragraphs 2 through 8 of the trial court's order, it has presented no argument challenging the trial court's authority to make findings of fact or its authority to adopt the findings of an expert witness when doing so.  Accordingly, the Department has waived any challenge to paragraph 3 of the commitment order.  See 177 Ill. 2d R. 341(e)(7); see also 
Med+Plus Neck & Back Pain Center, S.C. v. Noffsinger
, 311 Ill. App. 3d 853, 862 (2000).

Paragraph 2 of the commitment order requires the Department to treat respondent "in accordance with" Wahlstrom's report.  The Department argues that the Act requires a detailed treatment plan only when an individual is conditionally released and that no such plan is required when an individual is committed to a secure facility.  The Department further argues that, as in 
Owen
, it would be impossible for the Department to operate if every trial court were allowed to make decisions regarding the individualized treatment of detained or committed persons.  We disagree and hold that the Act requires individualized treatment of committed individuals.

Section 40(b)(2) requires the Department to treat an individual committed to a secure facility "in the least restrictive manner consistent with the requirements of the person."  725 ILCS 207/40(b)(2) (West 1998).  The Act also requires a trial court, when determining whether conditional release or institutional care in a secure facility is appropriate, to consider, 
inter alia
, "the person's mental history and present mental condition *** and what arrangements are available to ensure that the person has access to and will participate in necessary treatment."  725 ILCS 207/40(b)(2) (West 1998).  The Act also authorizes the trial court to order the Department to conduct an investigation, mental examination, or both "to assist the court in framing the commitment order."  725 ILCS 207/40(b)(1) (West 1998).  We conclude that these provisions, when read together, authorize a trial court to identify an individual's specific treatment needs and frame a commitment order consistent with those needs.  We further hold that the concerns identified in 
Owen
 regarding inconsistent court orders are inapplicable when, as here, the statute clearly contemplates individualized treatment.

The Department argues that, because a detailed treatment plan is mandatory under section 40(b)(3) for individuals conditionally released, and section 40(b)(2) lacks similar provisions, a trial court may not include a treatment plan in an order committing an individual to a secure facility under section 40(b)(2).  Generally, under the doctrine of 
expressio unius est exclusio alterius
, when a statute lists certain things, those things omitted were intended as exclusions.  
People ex rel. Klaeren v. Village of Lisle
, 316 Ill. App. 3d 770, 781 (2000).  However, the doctrine of construction 
in pari materia
 requires that we read these provisions together and adopt an interpretation that gives effect to both.  See 
Smith v. Silver Cross Hospital
, 312 Ill. App. 3d 210, 214 (2000).  Further, when possible, we must interpret a statute to give each provision some reasonable meaning and avoid an interpretation that would render a provision mere surplusage.  
Evans v. General Motors Corp.
, 314 Ill. App. 3d 609, 615 (2000).

The Department's proposed interpretation would render meaningless the Act's requirement that the Department treat a committed person "in accordance with the court's commitment order."  725 ILCS 207/40(b)(2) (West 1998).  
To avoid this result we hold that under section 40(b)(3) a trial court is required to approve a treatment plan, but that under section 40(b)(2) such provisions are optional and a trial court may exercise its discretion to impose reasonable conditions requiring specific treatment in an order committing an individual to a secure facility.  We note that Wahlstrom's report did not require a single specific course of treatment but instead proposed several alternative medical and psychological treatment methods.  Furthermore, Wahlstrom testified that the treatment programs in place at the Sheridan facility were adequate to provide the necessary treatment.  Therefore, we conclude that the trial court acted within its authority when it ordered the Department to provide treatment 
in accordance with
 Wahlstrom's report.

In paragraph 4 of the commitment order, the trial court ordered the Department to employ Wahlstrom to oversee respondent's treatment.  We find that this provision of the trial court's commitment order did exceed its authority to impose reasonable conditions on respondent's commitment.  The Act allows the court that committed a person under the Act to order a reexamination of the person at any time.  725 ILCS 207/55(c) (West 1998).  The Act also allows a trial court to appoint an expert to examine a committed person for the purpose of determining whether she or he has made sufficient progress to be conditionally released or discharged.  725 ILCS 207/55(a) (West 1998).  However, nothing in the Act suggests that the trial court may appoint an expert on a continuing basis to oversee implementation of a treatment plan.  More importantly, the Act specifically authorizes the Department to operate a secure facility and provide by rule for the nature of the facility and the level of care to be provided in the facility.  725 ILCS 207/50(b) (West 1998).  A trial court order appointing a specific individual to oversee treatment at the facility directly conflicts with the authority granted the Department by this section.  Therefore, the trial court's order appointing Wahlstrom is an attempt to direct the manner in which the Department operates its facility that exceeds the trial court's statutory authority.  See 
R.V.
, 288 Ill. App. 3d at 870.  Moreover, if each court committing a sexually violent person to a secure facility appointed its own expert to "oversee" that individual's treatment, the resources the Department would otherwise have available for treatment would be consumed by the administrative burden of multifarious reporting requirements.  See 
Owen
, 54 Ill. 2d at 109.  Accordingly, we determine that the trial court lacked the authority to appoint Wahlstrom to "oversee" respondent's treatment.

The remaining provisions of the commitment order implement the oversight required by paragraph 4.  For example, paragraph 5 required the Department to authorize Wahlstrom to consult with any medical provider or psychologist, paragraph 6 required a written report to the trial court, and paragraph 8 required the Department to pay Wahlstrom for his supervision of respondent's treatment.  Because we have determined that the trial court exceeded its statutory authority when it appointed Wahlstrom to oversee respondent's treatment, we also vacate those portions of the order implementing that oversight.

In conclusion, we find that the Act contemplates an interplay between the courts and the Department and an individualized plan of treatment for sexually violent persons committed to a secure facility.  Accordingly, the trial court may make findings of fact regarding an individual's mental condition and enter reasonable orders regarding the types of  treatment required.  However, it is the Department's duty under the Act to determine the nature of the secure facility and the manner in which treatment will be provided to those individuals detained or committed.  From the various treatment options available, the Department must individually tailor a plan consistent with a person's needs and the trial court's commitment order.  In other words, the trial court may identify the goals for a sexually violent person's treatment, but the Department has the duty of determining the means for achieving those goals.

Because the case at bar reaches us on an appeal from an order for commitment, it would be premature for us to determine what remedy, if any, is available if the Department fails to, or is unable to, provide appropriate treatment in a secure facility.  The record suggests that the trial court anticipated such a failure and attempted to fashion a prospective remedy through the appointment of Wahlstrom.  As we determined above, the trial court lacked the authority to do so.  Therefore, we vacate the trial court's commitment order in part and remand this cause for entry of an amended commitment order consistent with this opinion.

CONCLUSION

In No. 2--00--0392, we determine that the Act is not unconstitutional and, in the unpublished portion of this opinion, that the State did not fail to prove that respondent was a sexually violent person beyond a reasonable doubt.  In No. 2--00--0339, we determine that the Act authorizes a trial court to impose reasonable conditions on a sexually violent person's commitment.  However, we also determine that the provision of the trial court's order appointing Wahlstrom to oversee respondent's treatment and the related provisions implementing that oversight exceeded the trial court's statutory authority. 

Accordingly, we affirm the trial court's judgment declaring respondent a sexually violent person, affirm in part and vacate in part the trial court's commitment order, and remand this cause for entry of an amended commitment order consistent with this opinion.

No. 2--00--0339, Affirmed in part and vacated in part; cause remanded.

No. 2--00--0392, Affirmed.

McLAREN and GROMETER, JJ., concur.