THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHRISTOPHER BAILEY, Defendant-Appellant.

Third District    No. 3—09—0073

Opinion filed October 5, 2010.—Rehearing denied November 4, 2010.

WRIGHT, J., specially concurring.
McDADE, J., dissenting.

Ronald E. Boyer, of Ronald E. Boyer, P.C., of Watseka, for appellant.

James A. Devine, State's Attorney, of Watseka (Terry A. Mertel and Justin A. Nicolosi, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE CARTER delivered the opinion of the court:
After a bench trial, defendant, Christopher Bailey, was found to be

a sexually dangerous person (725 ILCS 205/1.01, 3 (West 2008)) and was committed to the Department of Corrections for an indefinite period for treatment. Defendant appeals from the trial court's ruling, arguing that: (1) the State failed to prove beyond a reasonable doubt that he was a sexually dangerous person, and (2) the trial court committed reversible error when it allowed the State to proceed on both the underlying criminal charge filed against him and the sexually-dangerous-person petition at the same time. We affirm the judgment of the trial court.

## FACTS

In September of 2006, defendant was charged with aggravated criminal sexual abuse (720 ILCS 5/12—16(d), (g) (West 2008)), a Class 2 felony. The charging instrument alleged that on or about September 6, 2006, defendant committed the alleged offense in that he committed an act of sexual penetration with M.B., who was at least 13 years of age but under 17 years of age when the offense was committed, and defendant was at least 5 years older than M.B. Defendant was arrested for that offense on September 7, 2006, was unable to post bond, and remained in custody throughout the initial proceedings. Aware that defendant was in custody and that his statutory speedy-trial term was running, the trial court set the case for a jury trial date of January 2, 2007, which defendant's attorney agreed was within defendant's speedy-trial term.

On November 15, 2006, while the criminal charge was pending and set for jury trial, the State filed a petition (hereinafter referred to as either the petition or as the sexually-dangerous-person petition), pursuant to the Sexually Dangerous Persons Act (Act) (725 ILCS 205/0.01 *et seq.* (West 2008)), to have defendant declared a sexually dangerous person. As required by the Act (725 ILCS 205/4 (West 2008)), the trial court ordered that defendant be evaluated by two psychologists with regard to the petition.

In December of 2006, defendant filed in open court a motion to dismiss the petition. At a pretrial conference that same day, the trial court moved the jury trial on the criminal charge to January 3, 2007, and set a hearing for January 2, 2007, on defendant's motion to strike the petition.

On January 2, 2007, the trial court denied defendant's motion to strike and gave defendant 14 days to file a responsive pleading to the petition. On motion of defendant, the jury trial on the underlying criminal charge was continued and the case was reset for jury trial by agreement to February 8, 2007. The case was also set for January 23, 2007, for a hearing on defendant's motion to suppress statements made to police, relative to the underlying criminal charge.

On January 23, 2007, defendant moved to continue the jury trial on the underlying criminal charge to March 28, 2007. Defendant had previously moved to continue the hearing on the motion to suppress statements and the case was set for February 5, 2007, for a status hearing.

The case was subsequently continued to March 12, 2007, for hearing on defendant's motion to suppress statements. On that date, an evidentiary hearing was held on defendant's motion to suppress. At the conclusion of the hearing, the trial court took the matter under advisement. The following day, the trial court issued its ruling denying the motion to suppress. The case remained set for March 28, 2007, for jury trial on the underlying criminal charge.

On March 28, 2007, defendant appeared in court with defense counsel. Defendant was still in custody at the time. Defendant waived his right to a jury trial on the underlying criminal charge. Pursuant to a contemplated possible plea agreement, the State filed a reduced charge of criminal sexual abuse (720 ILCS 5/12—15(a)(2) (West 2008)) against defendant, a Class 4 felony, alleging that defendant had committed an act of sexual conduct with M.B. and that at the time of the offense, he knew that M.B. was unable to consent to the sexual conduct. Defendant pled guilty to the reduced charge and the greater charge was ordered nol-prossed pursuant to the plea. The parties explained to the trial court that the possible plea agreement was contingent upon the results of a sex offender evaluation that defendant would have to obtain as the result of pleading guilty to a sex offense. If the evaluation indicated that defendant did not need secure confinement, it was contemplated that the parties would agree to a sentence of probation. If defendant received a less favorable evaluation, then defendant would have the right to withdraw his plea of guilty. In addition, the State made clear on the record that by entering into the plea agreement, it was not forfeiting the right to proceed on the sexually-dangerous-person petition that had previously been filed. The State pointed out to the court that proceedings on the petition could not go forward until it obtained a report from a second psychiatrist, which the State was trying to arrange. The parties further agreed that pending resolution of the remaining matters, defendant would be released on his own recognizance, subject to certain conditions. Defense counsel noted that defendant had already spent about 200 days in the county jail up to that point.

Defendant was duly admonished by the trial court regarding his plea of guilty and the conditional plea agreement. During those admonishments, the trial court cautioned defendant that even if the sex offender evaluation recommended that defendant be sentenced to

prison, defendant might still wish to adhere to his plea of guilty because he had pled guilty to a lesser offense, which was subject to a lesser sentence. The trial court pointed out to defendant that if he was later allowed to withdraw his guilty plea, the greater charge, the Class 2 felony, would be reinstated. The trial court also admonished defendant that the proceedings on the sexually-dangerous-person petition would continue, despite defendant's plea of guilty to the reduced underlying criminal charge. Defendant indicated that he understood all of the trial court's admonishments and that he wanted to go forward with his plea of guilty. The trial court found that the plea of guilty was knowingly and voluntarily made and accepted the plea. Defendant was released on his own recognizance subject to certain conditions, was ordered to obtain a sex offender evaluation, and was ordered to keep his appointment with the psychiatrist for the purpose of obtaining the second evaluation for the sexually-dangerous-person petition. The case was set for April 17, 2007, for status as to the second evaluation and for setting of a sentencing-hearing date on the underlying criminal charge and was later continued, through a series of continuances, to June 7, 2007, for status.

On June 7, 2007, at the status hearing, defense counsel informed the trial court that defendant would be seeking to withdraw his plea of guilty to the underlying criminal charge and that he would be filing a written motion for that purpose.

On November 2, 2007, the case came before the court for a hearing on the motion to withdraw guilty plea and for various other matters. At the start of the proceedings, the trial court summarized its recollection of the case stating, in part:

"My recollection is, and this goes back a while, that while the criminal case has been going on the State has also been pursuing a petition to have [defendant] declared sexually dangerous and that has been going on like 2 trains on a parallel track."

The trial court commented that it had received reports from the State's two psychiatrists relative to the sexually-dangerous-person petition. Defense counsel informed the trial court that he had obtained an expert of his own and that he was in the process of obtaining an evaluation of defendant from that expert for the purpose of the sexually-dangerous-person petition.

With some of the preliminary matters resolved, the trial court moved on to defendant's motion to withdraw the plea of guilty. The trial court admonished defendant that if he withdrew his plea, the State would reinstate the greater offense, the Class 2 felony, and that defendant would be subject to a possible punishment that was "almost twice as much" as the one for the offense to which defendant had pled

guilty. The trial court admonished defendant further that if he went to a sentencing hearing on the charge that he pled guilty to, the most he could get would be three years in prison and that if he went to trial on the greater charge, the least he could get would be three years in prison. Defendant indicated that he understood the trial court's admonishments and that he still wanted to withdraw his plea of guilty. The trial court allowed defendant's motion. Defendant's plea of guilty was withdrawn and the Class 2 felony was reinstated.

After the withdrawal of the guilty plea, the parties discussed the setting of a trial date. The following conversation ensued:

"THE COURT: Now, the next thing to do then I guess is to talk about a trial date because the trial is independent of the sexually dangerous matter, right?

[PROSECUTOR]: I think—

THE COURT: Or not? I guess it's up to the State, you are the plaintiff.

[PROSECUTOR]: I think my recollection is is [sic] that the sexually dangerous one should be proceeded on first and I think if that is found, that may preclude the trial because I don't think you can take 2 bites of the same type of apple.

THE COURT: I think you are probably right. Is there a jury trial on—I think you can get a jury trial on sexually dangerous. I'm sure you can.

[PROSECUTOR]: Yes. I don't know the rules. I don't know if you have to demand it or what the rules are precisely.

THE COURT: I think—aren't there jury instructions in the book for that? I think there are.

[PROSECUTOR]: I think there are.

THE COURT: Anyhow, that's not a decision I guess we have to make today. We need to get this expert on board so we can see where we are at. Why don't we just put the criminal case for status on November 30 at 1:30 as well because we can't really pick a date until we see where we are at in the other because I think the State is probably correct. Okay. Now, Mr. Bailey, you are still on bond and you have bond conditions, multiple bond conditions. You understand that you remain on bond with all those conditions?

THE DEFENDANT: Yes, sir."

The case was subsequently set for jury trial on the sexually-dangerous-person petition for March 18, 2008. On February 27, 2008, defendant waived his right to a jury trial on the petition and the case was set for a bench trial date of May 21, 2008.

A bench trial on the petition was started as scheduled on May 21, 2008, and took two days. The evidence presented at the trial can be summarized as follows.

Dr. Lawrence Jeckel testified for the State that he was a licensed physician in the State of Illinois and was board certified in psychiatry, psychoanalysis, and forensic psychiatry. Jeckel had been a board-certified psychiatrist for about 25 years and had practiced in the Champaign area since 1982. Over the course of his career, Jeckel had done approximately 40 evaluations for either sexually-dangerous or sexually-violent-person cases and had testified numerous times as an expert in court.

Pursuant to the State's request, Jeckel conducted an evaluation of defendant and prepared a report dated May 11, 2007, regarding that evaluation. In conducting an evaluation of defendant, Jeckel considered and relied upon hospital, police, and juvenile Department of Corrections (DOC) records and other matters that were pertinent to the case. Jeckel also met with defendant personally and watched a taped recording of defendant's interview with police relative to the pending criminal charge. In addition, on the date of his testimony, Jeckel was provided with, and reviewed, the sex offender evaluation that had been prepared for defendant's pending criminal charge by Dr. Jeff Reynolds. The sex offender evaluation was dated May 18, 2007.

During his testimony, Jeckel discussed in great detail defendant's history of inappropriate sexual behavior, which dated back to when defendant was a young boy, about the age of eight. Early on, defendant had been hospitalized for acting in a sexually inappropriate manner with family members. Defendant later molested his younger sister, had sexually inappropriate contact with a roommate, and had forcibly sodomized a 13-year-old boy with cerebral palsy at school. The latter incident happened in 1991 when defendant was 15 years old and resulted in defendant being criminally charged with aggravated criminal sexual abuse and adjudicated a delinquent minor. Defendant was committed to the sex offender unit of the juvenile DOC from December of 2001 to May of 2005 for that offense.

When Jeckel questioned defendant during their meeting about the matter with the handicapped boy at school, defendant denied that the incident happened and told Jeckel that he was wrongly accused. Jeckel noted that there had been an admission to the offense in 2001 and that defendant's subsequent denial of it during their interview indicated to Jeckel that defendant did not accept responsibility for his behavior. Jeckel testified that lack of remorse was a key indicator in his analysis because if a person failed to show remorse for his actions, he did not accept responsibility for those actions and could not limit or regulate his behavior. Jeckel described defendant as polymorphously promiscuous, sexually impulsive to others, and not very discriminating in his sexual impulses.

As part of his evaluation, Jeckel diagnosed defendant as having a narcissistic personality disorder with antisocial traits, a maladaptive personality disorder characterized by grandiose sense of self-importance. Jeckel also diagnosed defendant with paraphilia NOS. Jeckel defined paraphilia as recurrent intensive sexually arousing fantasies and behaviors involving nonconsenting persons over a period of at least six months and explained that NOS was a type of paraphilia that was nonspecific and was a term that was used to describe general inappropriate sexual impulsivity. According to Jeckel, paraphilia was a way that a person with a pathological personality channeled aggression. Jeckel explained that defendant's sexual conduct was not about intimacy, but rather about aggression being channeled into sex. The aggression also took the form of inflated self-esteem. That was the narcissistic side of the personality disorder, which was signified by grandiosity, high-mindedness, arrogance, contempt for others, denial of one's impact, impulsivity, deceitfulness, and lack of remorse. Jeckel commented that from a very early age, defendant was unable to manage his impulses and his aggressiveness.

Jeckel testified that he had reviewed Dr. Reynolds's report and had noted that defendant had scored very highly on a particular test that evaluated dishonesty and exploitiveness. Jeckel found that Dr. Reynolds's report was consistent with his own findings. Jeckel commented that defendant was very bright—one of the brightest persons that he had interviewed over the years—and that defendant could channel that intelligence into being manipulative. Jeckel stated that there was a concern that defendant's inappropriate sexual behavior could be exhibited to children because children were more easily manipulated and more easily swayed.

Jeckel opined that defendant satisfied the criteria of a sexually dangerous person. Jeckel noted that defendant's transgressiveness— defendant's pattern of crossing the boundaries of others, sexually and aggressively—was the most important concern for him and was what he based his opinion on regarding defendant's sexual dangerousness, that defendant could not keep his hands to himself and that he exploited others without appreciating the impact or even caring what the impact might be. Jeckel opined further in his written report that defendant would engage in sexually dangerous behavior in the future if not confined. Furthermore, in his written report, Jeckel specifically opined that defendant's "disorders significantly affect [his] emotional and volitional capacity, resulting in difficulty controlling sexual behavior."

On cross-examination, Jeckel testified that he did not view defendant as being a pedophile and that there was no specific

pedophilia with which he associated defendant. When asked if defendant's condition was basically an inability to control his impulses, Jeckel did not provide a "yes" or "no" answer, but rather testified that defendant's condition was an intensity of sexual impulses that were driven by aggression.

Dr. Arthur Traugott testified for the State that he was a licensed physician in the State of Illinois and was board certified in psychiatry. Traugott had been a psychiatrist for about 36 years and was still in active practice at the Carle Clinic.

Pursuant to the State's request, Traugott conducted an evaluation of defendant and prepared two reports regarding that evaluation, one dated April 3, 2007, and the other dated August 20, 2007. In conducting an evaluation of defendant, Traugott considered and relied upon information that was similar to that which had been considered and relied upon by Dr. Jeckel. Traugott also met with defendant in person and watched the tape-recorded police interview of defendant. As with Dr. Jeckel, on the date of his testimony, Traugott was provided with, and reviewed, the sex offender evaluation that had been prepared for defendant's pending criminal charge. However, Traugott did not rely on that particular evaluation in forming his diagnosis of defendant.

During his testimony, Traugott discussed, in somewhat less detail than Jeckel, the same incidents of defendant's inappropriate sexual conduct that had taken place as far back as defendant's early childhood. Defendant's family history indicated that defendant did not seem to express guilt or shame for his inappropriate behavior. Traugott commented that over the course of defendant's young life, although he was hospitalized and received treatment for his behavior several times, he did not seem to make any progress from the treatment and his inappropriate behavior did not seem to be altered as a result of the treatment.

When defendant was interviewed by Traugott, defendant admitted that he had performed a sexual act on his sister and said that it was the result of him being sexually abused by another youngster. Defendant told Traugott that he was ashamed of what he had done with his sister. However, Traugott did not believe that defendant's expression of shame was sincere. Rather, Traugott felt that defendant was merely making that statement because defendant thought it was the appropriate thing to say. As for the incident with the young boy with cerebral palsy at school, defendant denied that he had engaged in inappropriate sexual conduct and told Traugott that he was wrongly accused. Traugott was familiar with prior records where an admission to the incident had been made and defendant's current denial of the conduct gave Traugott great concern over the veracity and reliability

of defendant's statements. As to the pending criminal charge, defendant admitted that he had sexual relations with M.B. multiple times within a one-day or two-day period. Defendant indicated that M.B. was either 18 years old or an emancipated minor and that M.B.'s appearance was such that M.B. looked much older than 14.

Traugott commented that during his interview of defendant and the police interview as well, defendant described himself as a male nymphomaniac, which indicated to Traugott that defendant's conduct went beyond the typical male bravado in pursuing females for sexual activity. Traugott diagnosed defendant with an antisocial personality disorder, which Traugott said was commonly referred to as being a "sociopath." Traugott stated that it was his belief that defendant had that condition for more than one year prior to November of 2006. Traugott opined that defendant was a danger to society to "have such a continued sexual activity." Of concern to Traugott was defendant's prior sexual activity with children of both sexes and that there was no history of defendant, after age 18, having sexual activity with age-appropriate partners. Traugott opined further that based upon defendant's history of past sexual aggression, defendant should be confined.

On cross-examination, Traugott acknowledged that he did not diagnose defendant as having paraphilia and that the term "nymphomania" was not a term that was included in the DSM-IV diagnosis. Traugott commented that defendant's willingness to discuss his sexual exploits was quite unusual in an interview setting and stated that he found defendant's openness in that regard to be a negative factor in his diagnosis. Traugott also found defendant's denial of the sex act with the boy at school to be a significant factor in his diagnosis. Traugott acknowledged that defendant was currently 21 or 22 years old and that the basis for his finding of lack of control was based upon reports that went back to when defendant was 15 or 16 years old or younger. Traugott agreed that as people grew and matured into adults, they generally developed better impulse control.

On redirect examination, Traugott indicated that there was nothing that he had seen regarding defendant's current level of maturity that would cause him to change his diagnosis of defendant. According to Traugott, defendant's disorder had been progressive over defendant's lifetime and there was no period in which there seemed to be improvement or a change in defendant's behavior. Traugott commented that defendant's high level of intelligence enhanced his skill at being able to manipulate people and work the system. Traugott noted that defendant had a good knowledge of the legal system and of what his rights were and that defendant's intelligence allowed him to take

those facts and to turn them to his own personal advantage and to disregard the well-being of other people.

The victim in the underlying criminal charge, M.B., testified for the State that she first met defendant in September of 2006, around Labor Day weekend, at a park in Sheldon, Illinois. M.B. was 14 years old at the time and in eighth grade. M.B. talked to defendant at the park and told him that she was 14 years old. A couple of days later, on September 6, 2006, M.B. ran away from home and went to defendant's house. She got there at about 5:30 p.m. Defendant was home at the time, along with his sister and his mother. M.B. spent the night in defendant's bedroom with defendant. During the course of the night and into the morning hours of September 7, 2007, defendant and M.B. had consensual sexual intercourse seven or eight times. Prior to having sexual intercourse with defendant, M.B. told defendant that she was emancipated from her parents. M.B. eventually left the house on September 7 with defendant and they were eventually stopped by police.

On cross-examination, M.B. denied telling defendant that she was older than 14 and denied that she had made a statement to her probation officer that she had told defendant she was 19 years old.

Defendant's videotaped interview with police was subsequently admitted into evidence by the State and played for the trial court. The State also sought to admit Dr. Reynolds's evaluation. However, the trial court denied that request.

Dr. Daniel Yohanna testified for the defense that he was a board-certified psychiatrist and forensic psychiatrist and that he worked for the University of Chicago as the clinical mission director. Yohanna had been with the University of Chicago for three years and prior to that had been with Northwestern University since 1986.

Yohanna was appointed to perform a psychiatric evaluation on defendant for the defense and to prepare a report regarding that evaluation. Prior to conducting his evaluation, Yohanna reviewed some psychological records from when defendant was in school, the reports of Dr. Traugott, and a previous assessment of defendant done in 2001 by a Mr. Mitchell. As part of his evaluation, Yohanna also interviewed defendant and his mother.

Yohanna diagnosed defendant as having an antisocial personality disorder. In other words, according to Yohanna, defendant was a sociopath, a person who had a disregard for other peoples' rights and was manipulative to get his own way for his own gratification. Yohanna had reviewed Dr. Jeckel's evaluation after he had conducted his own evaluation and disagreed with Dr. Jeckel's conclusions in a couple of respects. First, Yohanna found no evidence that defendant had

paraphilia or pedophilia. Yohanna commented that a finding of paraphilia required that the person consistently used assault or force for sexual activity or the nonconsent of other persons and Yohanna did not feel that such a diagnosis applied to defendant. Second, in Yohanna's opinion, defendant did not meet the criteria of a sexually dangerous person. Yohanna stated that he saw no evidence in his evaluation of defendant that defendant had a sexual interest in children. Yohanna also saw no evidence that defendant had a fantasy life about consistent, aggressive sexual behavior. Yohanna commented that defendant would manipulate or lie to take advantage of people, but would not necessarily be sexually dangerous or sexually violent.

On cross-examination, Yohanna acknowledged that in conducting his evaluation, he did not review any police reports or DOC records and did not view defendant's videotaped interview relating to the pending criminal charge. The facts that defendant had sexual interaction with his sister and later with a handicapped boy at school and was now accused of having sexual intercourse with a 14-year-old girl did not change Yohanna's opinion on whether defendant was a sexually dangerous person. Yohanna explained that he did not consider defendant's conduct to demonstrate a repetition of assaultive behavior but rather considered it to only show that defendant would manipulate people to get what he wanted. Yohanna believed that defendant had had an antisocial personality disorder for well over a year prior to 2006 and stated that there was no recognized treatment for such a disorder and that defendant did not appear to be motivated to get treatment. Furthermore, in his written report, Yohanna opined that defendant would "likely take advantage of others for sexual gratification consistent with his antisocial personality but not necessarily in a forceful manner." Yohanna opined further in his report that defendant could very well be manipulative in his relationships for sexual gratification and that defendant could be a "sexual nymphomaniac" as defendant had stated, but that defendant did not meet the criteria for a sexually dangerous person.

After the attorneys had finished questioning Yohanna, the trial judge asked Yohanna some questions of his own. The trial judge went through defendant's history with Yohanna and confirmed that Yohanna had taken all of those matters into account. Yohanna testified that defendant, as a sociopath, did not feel empathy for other people and would not be as bothered by, or would tend to disregard, the hurtful things that he did to others. In response to one of the trial judge's questions, Yohanna confirmed that it was his opinion that defendant was likely to commit a crime because he was a sociopath, but was not necessarily likely to commit a sex crime against a child.

Crissy Sabol testified for the defense that she was M.B.'s juvenile probation officer. In February of 2007, Sabol had a conversation with M.B. about the allegations of sexual activity between M.B. and defendant. During that conversation, M.B. stated to Sabol that she had told defendant that she was 19 years old.

On cross-examination, Sabol stated that M.B. also told her that later in the evening when she was with defendant, defendant confronted her about her age because defendant's friend had told him that she was 14. M.B. told defendant at that time that she was 14. M.B. told Sabol further that she and defendant had intercourse two more times after defendant learned her true age. M.B. told Sabol in a later conversation in March of 2007 that defendant had paid her $50 to have sex with him. During that later conversation, M.B. again told Sabol that she had told defendant that she was 14 years old.

Laura Lucille Smalley testified for the defense that she was 21 years old, was defendant's fiancée, and was pregnant with defendant's child. Smalley met defendant in November of 2007 through an Internet dating site. Smalley described her relationship with defendant as a healthy one and stated that she had not had any mental or emotional problems with defendant and had not found defendant to be manipulative.

On May 28, 2008, at the conclusion of the bench trial, the trial court announced its ruling. Initially, the trial court cited the law on the issue, stating as follows:

> "All right. Well, we will show then for the record that the court has considered all of the evidence including the exhibits and I have reviewed my own notes that I took during the hearing and, of course, we agree that the burden of proof in this matter just [sic] be beyond a reasonable doubt. I think we have to start with the statute, which does require that there be a mental disorder, which has existed for a period of not less than 1 year immediately prior to the filing of the petition, which I think was filed in November of [2006], coupled with criminal propensities to the commission of sexual offenses and the person must demonstrate propensity toward acts of sexual assault or acts of sexual molestation of children.
>
> Now, in addition to that the United States Supreme Court has held that there must be some proof of a serious difficulty in controlling behavior. That's where the word volitional capacity comes in. You do not have to show a complete lack of control, but you have to show the person has control problems greater than, it says here, greater than a typical recidivist convicted in an ordinary criminal case.

Now, I've considered all the evidence and the psychiatrists, I guess it's my call on their credibility. I want to say at the outset the State has to have 2 doctors examine the defendant and I gave the defendant a chance to have his own doctor. There is no requirement in the law that all 3 doctors agree. There is no requirement in the law that the 2 state psychiatrists agree. What is required is that I examine all the evidence and make a finding whether a reasonable doubt exists or not."

Proceeding further on its ruling, the trial court made numerous findings. First, after considering the evidence, the trial court found that defendant had a mental disorder, antisocial behavior (sociopath), and that the disorder had existed for more than one year prior to the filing of the petition.

Second, the trial court found that defendant had a criminal propensity to commit sexual offenses. The trial court based that finding on the evidence that defendant had engaged in sexual misconduct with his sister and with the handicapped boy at school and that defendant had stated that he was a male nymphomaniac. The trial court noted that the State did not have to prove the pending allegations regarding M.B. in the sexually dangerous proceeding and commented that the law was such that if it found defendant to be a sexually dangerous person, defendant could not be tried on the underlying criminal allegation. The trial court noted further, however, that after reviewing the testimony at trial and defendant's videotaped interview with the police, it was convinced that defendant knew M.B. was underage when defendant had sexual intercourse with M.B.

Third, the trial court found that defendant had demonstrated a propensity toward sexual assault or acts of molestation of children. The trial court noted that there had been at least two prior instances of such misconduct, the incident with defendant's sister and the incident with the handicapped boy. The trial court commented that there was also evidence that defendant had engaged in some type of interaction with a roommate at one of the institutions he was in and that while defendant was in therapeutic schools, he was reported to need constant supervision, had many incidents and suspensions, had made inappropriate sexual comments and threats toward others and himself, and was noncompliant with medications.

Fourth, the trial court found that defendant lacked the ability to control his behavior. In making that finding, the trial court commented as follows:

"Now, does he have the necessary lack of control of himself that is now required by the Supreme Court? In other words, what is his volitional capacity? Now, I looked at the reports of the doctor [sic]

and, of course, considered their testimony. It struck me that Dr. Yohanna did not maybe look at the same documents and things that the other doctors did. Also as I have said Dr. Jeckel has specialized I think in forensic psychiatry and in this field Dr. Yohanna did not. The other thing I think we need to note on the propensity issue and on this issue of self control that he was in the Juvenile Department of Corrections sexual unit from December of 2001 until November of 2005 where his behavior was controlled, where he was not allowed unfettered access, or whatever you want to call it. This incident here allegedly occurred in September of [2006], which is a year—less than a year after he was released and about 4 months after he went off parole, which is also a form of control. The thing that concerns me in this area is the diagnosis. All agreed on that he is anti-social. Dr. Yohanna himself said there was no cure, that he would be impulsive and aggressive, assault others, that sociopaths believe that rules do not apply to them, that they are not concerned with the consequence of their actions as it may affect others, that they are unable to express remorse. And Dr. Jeckel pointed out, you know, remorse is one of those things that helps us regulate our own behavior. If we feel bad about doing something, we don't do it again. He doesn't feel that. He is manipulative. This is part of being a sociopath and [sic] believes he can do whatever he wants. I think Dr. Jeckel said that.

Now, you couple that with his obvious intelligence, you couple that with the statement he made that he was a male nymphomaniac, then you start looking at the kind of person that a sociopath is and self control is not in their equation. I mean, if you think you can do whatever you want to do and you don't care if it hurts somebody else, then how can it be said that you have self control. I think that's part of the problem. I don't think we've had a clear test because he has not been out of custody long enough. And then, of course, we have to remember, too, when this was filed in September of [2006] Mr. Bailey went into county jail and was over there for a long time. So you know, when he is locked up like that it's not I think a fair test of his ability to control himself.

\*\*\* Both Dr. Jeckel and Dr. Traugott found that he had a decreased volitional capacity. Both of them think that he will reoffend. Both Dr. Traugott and Dr. Jeckel recommend residential setting. Both have given the opinion that he is a sexually dangerous person.

Now, the *statute* does not require the proof that anything will happen. It is impossible *to* prove what will happen in the future. I'm quoting now from the People versus Hancock, which is 329 Ill. App. 3rd 367. Says the state need only prove that respondent has demonstrated a propensity to commit acts. Propensity is defined as

inclination, a tendency towards an urge to or doing something. And that's where we are. The issue is what does—does he have a propensity to do it and can he control the propensity I guess is where we are at. And the People versus Castman, it says the act presumes the serious difficulty in controlling behavior. If a person cannot control his dangerous behavior to the extent that he is predisposed to commit sexual acts and thus endanger others, then that person has sufficient volitional impairment [*sic*] be found a sexually dangerous person."

The trial court went on to find that the State had proven beyond a reasonable doubt that defendant was a sexually dangerous person. The trial court appointed the Director of the Department of Corrections as the guardian of defendant and committed defendant to the Department of Corrections for an indefinite period for treatment.

Defendant subsequently filed a posttrial motion for new trial. In the motion, defendant alleged, among other things, that he had not been proven beyond a reasonable doubt to be a sexually dangerous person. Defendant argued that the State had failed to prove that there was a causal connection between his mental disorder and his inappropriate sexual behavior and that the State had also failed to prove that defendant had a mental condition that caused him to have serious difficulty in controlling his criminal sexual behavior. In support of his arguments, defendant cited *People v. Masterson*, 207 Ill. 2d 305, 798 N.E.2d 735 (2003), *People v. Gilford*, 361 Ill. App. 3d 56, 836 N.E.2d 825 (2005), and *Kansas v. Crane*, 534 U.S. 407, 151 L. Ed. 2d 856, 122 S. Ct. 867 (2002). After hearing the arguments of the attorneys and of defendant himself, the trial court took the motion under advisement. The trial court later denied defendant's posttrial motion for new trial. This appeal followed.

## ANALYSIS

On appeal, defendant argues first that he was not proven beyond a reasonable doubt to be a sexually dangerous person. Specifically, defendant asserts that the State failed to elicit any evidence to establish that defendant had a volitional impairment that would cause him serious difficulty in controlling his sexual impulses and behavior. Defendant asserts further that such evidence is required under the current status of the law to establish that defendant has the requisite mental disorder necessary for a finding of sexually dangerous.

The State argues that the evidence was sufficient to prove beyond a reasonable doubt that defendant was a sexually dangerous person. The State asserts that the trial court properly found that defendant did not have the ability to control his sexual behavior and that the trial court's finding was properly supported by the psychologists'

testimony that defendant had trouble controlling his sexual behavior and that defendant might have problems with committing sex acts in the future. The State contends, therefore, that the trial court's finding—that defendant is a sexually dangerous person—should be upheld on appeal.

■ To prevail on a sexually-dangerous-person petition under the Act, the State must prove three elements beyond a reasonable doubt relative to the defendant: " '(1) the existence of a mental disorder for more than one year; (2) the existence of criminal propensities to the commission of sex offenses; and (3) the existence of demonstrated propensities toward acts of sexual assault or acts of sexual molestation of children.' " *People v. Allen*, 107 Ill. 2d 91, 105, 481 N.E.2d 690, 697 (1985), quoting *People v. Pembrock*, 62 Ill. 2d 317, 321-22, 342 N.E.2d 28, 30 (1976); see also *People v. Masterson*, 207 Ill. 2d 305, 318-19, 798 N.E.2d 735, 743 (2003); 725 ILCS 205/1.01, 3, 3.01 (West 2008). The only element in dispute in the instant appeal is the first element, which pertains to the defendant's mental disorder.

The term "mental disorder," as used in the Act, has been construed to mean "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes [the defendant] to engage in the commission of sex offenses and results in serious difficulty controlling sexual behavior." *Masterson*, 207 Ill. 2d at 329, 798 N.E.2d at 749; see also 725 ILCS 205/4.03 (West 2008). The mental disorder that the defendant suffers from must be causally related to the defendant's propensity to commit sex offenses, and the requirement that the defendant has demonstrated the propensity toward acts of sexual assault or acts of sexual molestation of children by his actions is an important indicator of both a mental disorder and future dangerousness. *Masterson*, 207 Ill. 2d at 328, 798 N.E.2d at 748. "By acting upon their propensities, those suffering from mental disorders demonstrate dangerousness and impaired volitional capacity." *Masterson*, 207 Ill. 2d at 328, 798 N.E.2d at 748. In fact, "[d]angerousness and lack of control are the touchstones for civil commitment." *Masterson*, 207 Ill. 2d at 328, 798 N.E.2d at 748. "The 'serious difficulty' finding required by the State's petition should be made by the trier of fact, which is in a superior position to hear the expert testimony, weigh the evidence, and decide if defendant's diagnosed mental condition makes it seriously difficult for him to control his behavior, thereby justifying civil commitment under the [Act]." *People v. Gilford*, 361 Ill. App. 3d 56, 61, 836 N.E.2d 825, 830 (2005). In addition, for a finding of sexually dangerous to be valid under the Act, there must also be an explicit finding that it is substantially probable that the defendant would engage in the commission of sex offenses in the future if not confined. *Masterson*, 207 Ill. 2d at 330, 798 N.E.2d at 749.

On appeal from a trial court or jury's ruling on a sexually-dangerous-person petition, the reviewing court must consider all of the evidence introduced at trial in the light most favorable to the State and then determine whether any rational trier of fact could have found the essential elements to be proven beyond a reasonable doubt. See *People v. Trainor*, 337 Ill. App. 3d 788, 793, 785 N.E.2d 568, 573 (2003). If so, the reviewing court must affirm the trial court or jury's ruling. The reviewing court will not substitute its judgment for that of the trial court or jury on the factual issues that have been raised in the petition, unless the evidence is so improbable as to raise a reasonable doubt that the defendant is a sexually dangerous person. See *Allen*, 107 Ill. 2d at 106, 481 N.E.2d at 697.

■ In the present case, it is clear from the record passages cited above that the trial court was aware of the volitional-capacity requirement as it related to the mental disorder element. The trial court specifically found that defendant lacked the ability to control his sexual behavior. That finding was supported by ample evidence in the record. First of all, the trial court's finding was supported by the evidence presented regarding defendant's prior history of inappropriate sexual behavior. The trial court heard evidence of numerous incidents dating back to when defendant was a young child. From an early age, it was apparent that defendant could not control his sexual behavior. Defendant had engaged in inappropriate sexual behavior with family members, had molested his younger sister, had forcibly sodomized a young handicapped boy at school, had sexual interaction with a roommate, and, as an adult, had sexual intercourse with a 14-year-old girl. By acting on his impulses time and time again, defendant demonstrated his dangerousness and his impaired volitional capacity. See *Masterson*, 207 Ill. 2d at 328, 798 N.E.2d at 748.

Second, the trial court's finding was supported by the expert opinion testimony of Dr. Jeckel and Dr. Traugott, and to some extent, Dr. Yohanna. Dr. Jeckel testified that defendant lacked remorse for his inappropriate conduct and that a person that did not feel remorse could not regulate his own behavior. Jeckel stated that defendant could not keep his hands to himself and that defendant's condition was an intensity of sexual impulses that were driven by aggression. Jeckel opined that defendant would engage in sexually dangerous behavior in the future if not confined. Jeckel opined further in his written report that defendant's mental disorder significantly affected his volitional capacity and resulted in difficulty controlling sexual behavior. Dr. Traugott testified that defendant seemed to lack shame or remorse for his inappropriate sexual behavior. Traugott acknowledged that his finding of lack of control was based upon incidents that

went back to when defendant was 15 years old and younger, but commented that he did not see anything in defendant's current level of maturity that would alter his conclusion. Traugott noted that despite numerous placements in treatment, there was no time when defendant's condition seemed to improve or when defendant changed his behavior. Similar to Dr. Jeckel's opinion, Dr. Traugott also opined that defendant was a danger to society and that defendant should be confined. Dr. Yohanna testified that defendant, as a sociopath, did not have empathy for others and would tend to disregard the hurtful things he did to others. Yohanna recognized that there was no treatment for defendant's condition and that defendant was not motivated to engage in treatment. Yohanna also recognized that defendant would manipulate others to get what he wanted, including sexual gratification.

And third, the trial court's finding was supported by the evidence that defendant had described himself to the police and to one of the psychiatrists as a "male nymphomaniac." Based on the evidence presented, we are unable to say that no rational trier of fact would have found the first element was not proven beyond a reasonable doubt. The trial court's finding in that regard, therefore, must be affirmed. See *Trainor*, 337 Ill. App. 3d at 793, 785 N.E.2d at 573. We will not substitute our judgment for that of the trier of fact as to that finding. See *Allen*, 107 Ill. 2d at 106, 481 N.E.2d at 697.

In reaching that conclusion, we note that defendant expresses concern on appeal that the attorneys and the trial court were not aware of the "serious difficulty" requirement set forth in the supreme court case of *People v. Masterson*. However, in reviewing the record from the trial court, especially the passages quoted above, it is clear that the trial court knew of and understood that requirement, even if it did not specifically cite the *Masterson* case. Indeed, it appears that the "serious difficulty" requirement was the only finding that the trial court really had a difficult time making. Moreover, at the hearing on defendant's posttrial motion, defense counsel specifically cited *Masterson* and specifically argued that the State had failed to prove the "serious difficulty" requirement. The trial court heard those arguments and, then, after taking the matter under advisement, denied defendant's posttrial motion for a new trial. We, therefore, reject defendant's argument on this point.

■ As his second point of contention on appeal, defendant argues that the trial court committed reversible error when it allowed the State to proceed on both the underlying criminal charge and the sexually-dangerous-person petition at the same time. Defendant asserts that the manner in which the trial court allowed this case to

proceed resulted in severe prejudice to him in that it caused him to make an unwise and involuntary decision to withdraw his plea of guilty to the lesser offense. Defendant asserts further that had he maintained his plea of guilty, the State would have been precluded from proceeding on the sexually-dangerous-person petition. Defendant contends that the prejudice was compounded, to the extent that he was deprived of his due process rights, when the trial court incorrectly admonished him at the time of the plea that the sexually-dangerous-person petition would still go forward and failed to admonish him when he sought to withdraw his plea of guilty that doing so would allow the State to proceed on the sexually-dangerous-person petition. In other words, defendant argues that the alleged incorrect admonishments impacted his due process rights in the sexually-dangerous-person petition. We are not called upon to address this issue in the context of the criminal charge itself. Defendant also asserts that allowing the criminal charge and the sexually-dangerous-person petition to proceed simultaneously, allowed the State to obtain evidence that it would not otherwise have received—the evaluation of the three psychiatrists—that it could later use in the criminal proceedings in violation of defendant's right against self-incrimination. In addition, defendant contends that the State was also provided with evidence in the sexually-dangerous-person proceeding that it would not have otherwise received, in the form of Dr. Reynolds's sex-offender evaluation, and that Dr. Jeckel and Dr. Traugott improperly relied on Dr. Reynolds's evaluation in concluding that defendant was a sexually dangerous person.

The State argues that the trial court did not err in allowing "preliminary proceedings" to go forward on the underlying criminal charge at the same time as proceedings on the sexually-dangerous-person petition. The State disagrees with all of defendant's assertions and contentions as set forth above and notes that it was only logical for the trial court to allow simultaneous proceedings to some extent to avoid unnecessary delay in the criminal case, in the event that defendant was found not to be a sexually dangerous person.

A decision made by the trial judge in overseeing his or her courtroom or in maintaining the progress of a trial or other proceeding is generally subject to an abuse-of-discretion standard of review on appeal. *People v. Coleman*, 183 Ill. 2d 366, 387, 701 N.E.2d 1063, 1074 (1998). An abuse of discretion occurs only when no reasonable person would take the view adopted by the trial court. *In re Leona W.*, 228 Ill. 2d 439, 460, 888 N.E.2d 72, 83 (2008).

In the present case, after reviewing the record, we find that the trial court did not commit an abuse of discretion in initially allowing

the pending criminal charge and the sexually-dangerous-person petition to proceed simultaneously and that defendant was not prejudiced by the manner in which the trial court allowed this case to proceed. See *Coleman*, 183 Ill. 2d at 387, 701 N.E.2d at 1074; *Leona W.*, 228 Ill. 2d at 460, 888 N.E.2d at 83. In reaching that conclusion, we note that in cases where a sexually-dangerous-person petition has been filed, it may be to a defendant's advantage to have some of the initial proceedings on the underling criminal charge and the sexually-dangerous-person petition occur simultaneously to reduce unnecessary delay and to provide the defendant with the ability to attack the underlying criminal charge, such as through a motion to suppress evidence or statements, as a method of also attacking the sexually-dangerous-person petition, which cannot stand in the absence of the underlying criminal charge. See 725 ILCS 205/3 (West 2008).

Contrary to defendant's argument on appeal, there was nothing confusing or improper about the trial court's admonishments relative to the plea of guilty and the withdrawal of that plea. The trial court made it abundantly clear to defendant that the sexually-dangerous-person petition would go forward regardless of the plea and that defendant might want to adhere to the plea agreement even if the evaluation from Dr. Reynolds came back with an unfavorable recommendation. Although defendant asserts that under this court's prior decision in *People v. Galba*, 273 Ill. App. 3d 95, 652 N.E.2d 400 (1995), the sexually-dangerous-person petition could not go forward once defendant had pled guilty to the pending criminal charge, we reach no such conclusion. *People v. Galba* stands for the legal proposition that a defendant cannot be found to be a sexually dangerous person and still be punished for the underlying criminal offense. See *Galba*, 273 Ill. App. 3d at 97-101, 652 N.E.2d at 402-05. That is so because one of the purposes of the Act is to obtain treatment, rather than punishment, for a mentally ill defendant. See *Allen*, 107 Ill. 2d at 100-01, 481 N.E.2d at 695. As noted in *Galba*, the Act mandates that when the defendant's treatment has been successful and the defendant has recovered, the underlying criminal charge or charges must be dismissed. *Galba*, 273 Ill. App. 3d at 101, 652 N.E.2d at 405; 725 ILCS 205/9 (West 2008). However, our review of the record indicates that nothing occurred in the present case that was contrary to the holding in *Galba*. See *Galba*, 273 Ill. App. 3d at 97-101, 652 N.E.2d at 402-05. The instant defendant was not found to be a sexually dangerous person and then simultaneously or subsequently punished for the underlying criminal offense. Once the sexually-dangerous-person petition was set at first for jury trial and, then, subsequently for bench trial, there were no further substantive matters set on the criminal charge. In this record, no

sentence was ever entered on the criminal charge. Therefore, defendant's argument regarding *Galba* has no merit here.

We also do not agree with defendant's assertion that he was prejudiced by the fact that Dr. Reynolds's evaluation relative to the criminal charge was made available in the proceedings on the sexually-dangerous-person petition. Although at one point during his testimony, Dr. Jeckel may have stated that he relied upon the report, it was clear from the record that Dr. Jeckel had not received the report until the day of his testimony and that the most that he could say was that Dr. Reynolds's findings were consistent with his own. Dr. Traugott, on the other hand, specifically testified that he did not consider or rely on the report in forming his conclusions and the trial court denied the State's request to admit Dr. Reynolds's report into evidence at the trial on the sexually-dangerous-person petition. Thus, we find defendant's contention regarding Dr. Reynolds's report to be without merit. Furthermore, although defendant also asserts that the psychiatrists' evaluations could be used against him in the criminal case in violation of his right against self-incrimination, that assertion is not supported by the law on this issue. It is well established that such statements may not be used in the underlying criminal proceeding. See *Allen*, 107 Ill. 2d at 104, 481 N.E.2d at 696. Defendant's contention in that regard, therefore, is also without merit.

For the foregoing reasons, we affirm the judgment of the circuit court of Iroquois County.

Affirmed.

JUSTICE WRIGHT, specially concurring:

In this appeal, the record does not demonstrate that Bailey objected when the trial court scheduled matters related to the civil petition on the same date as matters related to the pretrial criminal proceedings. Nor does it appear to me that Bailey included this issue in his posttrial motion requesting a new trial on the sexually-dangerous-person petition. Instead, the record suggests the parties mutually participated in the simultaneous pretrial proceedings without objection. Thus, I respectfully conclude that the issue has been waived and was not properly preserved for our review.

However, assuming this issue of simultaneous pretrial proceedings has not been waived, I agree that the trial court did not abuse its discretion in this case. Finally, after considering all of the evidence introduced by the State during trial on the State's sexually-dangerous-person petition alone, in the light most favorable to the State, I share the author's view regarding the sufficiency of the State's evidence in this case.

Therefore, I agree that the trial court's decision, declaring Bailey to be a sexually dangerous person as defined by the Act, must be affirmed.

JUSTICE McDADE, dissenting:

The majority judgment affirms the trial court's order finding that defendant is sexually dangerous beyond a reasonable doubt because, *inter alia*, he suffers from a mental disorder as defined in the Act. 405 Ill. App. 3d at 171. The majority judgment recognizes that "to be valid under the Act, there must also be an explicit finding that it is substantially probable[1] that the defendant would engage in the commission of sex offenses in the future if not confined." 405 Ill. App. 3d at 170, citing *People v. Masterson*, 207 Ill. 2d 305, 330, 798 N.E.2d 735, 749 (2003). Because the record does not contain an explicit finding of that fact, I would find that the trial court's order that defendant is a sexually dangerous person is not valid under the Act. *Masterson*, 207 Ill. 2d at 330, 798 N.E.2d at 749.

The majority judgment also finds that the trial court did not prejudice defendant's right to due process in the sexually-dangerous-person proceedings by initially allowing the pending criminal charge and the sexually-dangerous-person petition to proceed simultaneously. 405 Ill. App. 3d at 173-74. Because defendant failed to object to the simultaneous proceedings, I would decline to address the propriety of those proceedings on the grounds defendant forfeited review of any error. *People v. Owens*, 394 Ill. App. 3d 147, 152, 914 N.E.2d 1280, 1284-85 (2009) ("the defendant may forfeit review of any error, even an error of constitutional magnitude, where the defendant's trial counsel fails to raise a timely objection and include that objection in a posttrial motion").

Turning to the merits of the conviction, the supreme court has construed the Act as

"requiring proof of three separate elements:
'(1) the existence of a mental disorder for more than one year; (2) the existence of criminal propensities to the commission of sex offenses; and (3) the existence of demonstrated propensities toward acts of sexual assault or acts of sexual molestation of children.' " *People v. Allen*, 107 Ill. 2d 91, 105, 481 N.E.2d 690, 697 (1985), quoting *People v. Pembrock*, 62 Ill. 2d 317, 321-22, 342 N.E.2d 28 (1976).

---

[1]The decision in *Masterson* actually encloses the words "substantially probable" in quotation marks.

To ensure that the Act comported with minimal standards of due process, the *Masterson* court read "the SVPA's definition of 'mental disorder' *** into the SDPA to the extent consistency allows and augmented with the standard that appears to emerge from *Crane*." *Masterson*, 207 Ill. 2d at 329, 798 N.E.2d at 749. Under *Masterson*, "mental disorder" for purposes of the Act means " 'a congenital or acquired condition affecting the emotional or volitional capacity that predisposes [the defendant] to engage in the commission of sex offenses and results in serious difficulty controlling sexual behavior.' " 405 Ill. App. 3d at 170, quoting *Masterson*, 207 Ill. 2d at 329, 798 N.E.2d at 749.[2] In addition to defining mental disorder as used in the Act, the *Masterson* court further clarified the "requirements for commitment under the SDPA, specifically, the implicit requirement of section 1.01 of the SDPA (725 ILCS 205/1.01 (West 2000)) that a person must present a danger to offend in the future before he or she may be committed under the Act." *Masterson*, 207 Ill. 2d at 330, 798 N.E.2d at 749. The court held:

> "[A] finding of sexual dangerousness premised upon the elements of section 1.01 of the SDPA (725 ILCS 205/1.01 (West 2000)) must hereafter be accompanied by an explicit finding that it is 'substantially probable' the person subject to the commitment proceeding will engage in the commission of sex offenses in the future if not confined." *Masterson*, 207 Ill. 2d at 330, 798 N.E.2d at 749.

The majority's judgment implies that any finding of a lack of ability to control sexual behavior (405 Ill. App. 3d at 171) equates with an explicit finding of a substantial probability that the person subject to the commitment proceeding will engage in the commission of sex offenses in the future if not confined. What emerges from *Masterson*, however, are distinct elements that the State must prove before a subject may be committed under the Act. The State must prove that the person suffers from a mental disorder affecting volitional capacity, but diminished volitional capacity alone is not enough. *Masterson* requires a separate finding that "it is 'substantially probable' the person *** will engage in the commission of sex offenses in the future." *Masterson*, 207 Ill. 2d at 330, 798 N.E.2d at 749.

While any degree of a lack of ability to control sexual behavior is *evidence* that a substantial probability may exist that the subject will commit sex offenses in the future, the majority cites no authority for a

---

[2]In 2006, the legislature amended the Act to define "mental disorder" as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 205/4.03 (West 2008).

broad finding that such evidence constitutes sufficient *proof* of that fact absent an explicit finding of a substantial probability. The court has found that a substantial probability of committing sex offenses in the future if not confined means that it is " 'much more likely than not' " (*In re Detention of Hayes*, 321 Ill. App. 3d 178, 189, 747 N.E.2d 444, 454 (2001), quoting *In re Detention of Bailey*, 317 Ill. App. 3d 1072, 1086 (2000)) that the subject will commit offenses in the future, not just that the subject has some condition affecting volitional capacity.

My dispute is not with whether the trial court "knew of and understood that requirement." 405 Ill. App. 3d at 172. In my opinion, the majority is cavalier in its treatment of the requirement that a finding of sexual dangerousness "be accompanied by an *explicit* finding that it is 'substantially probable' the person subject to the commitment proceeding will engage in the commission of sex offenses in the future if not confined." (Emphasis added.) *Masterson*, 207 Ill. 2d at 330, 798 N.E.2d at 749. It reasons that requirement is satisfied by the fact that at the hearing on the posttrial motion defense counsel argued that the State failed to prove the serious difficulty requirement, the trial court heard those arguments, and denied the motion. I do not agree with the implication from the majority that an implicit rejection of a position is an explicit finding of its opposite.

Moreover, the majority's judgment establishes a precedent for relying on any finding of a "lack of control" to satisfy the requirement for a finding of a substantial probability that the person subject to the commitment proceeding will engage in the commission of sex offenses in the future if not confined and to permit affirmance on this lesser showing. The *Masterson* court clearly delineated between a finding of diminished volitional capacity and a finding of a substantial probability the subject would commit sex offenses in the future. The court had already defined " 'mental disorder' as used in the [Act] to mean a *** condition affecting the emotional or volitional capacity." *Masterson*, 207 Ill. 2d at 329, 798 N.E.2d at 749. The court went on to state that it was "appropriate, at this juncture, to *also* clarify the requirements for commitment under the [Act], specifically, the implicit requirement *** that a person must present a danger to offend in the future before he or she may be committed under the Act." (Emphasis added.) *Masterson*, 207 Ill. 2d at 330, 798 N.E.2d at 749.

Dr. Jeckel opined that "defendant would engage in sexually dangerous behavior in the future if not confined." 405 Ill. App. 3d at 171. I do not reject Dr. Jeckel's opinion as evidence that it is substantially probable that defendant will engage in the commission of sex offenses in the future if not confined. I would simply require the

trial court consider the evidence, exercise its discretion, and make an explicit finding that it *is* substantially probable, as *Masterson* requires.

The majority's affirmance of the trial court's order in this case, which does not contain the required explicit findings, forecloses requiring the trial court in future cases to actually exercise its discretion to consider other evidence that might make it less than "much more likely than not" that the subject will commit sex offenses in the future. It is not necessary to speculate what that evidence might be or whether it exists in this case. The basis of my dissent is the failure to adhere to the standards expressly stated by the supreme court and my view that the majority's judgment debilitates that standard. I would not necessarily disagree that "no rational trier of fact *would* have found the *** element[s] [were] not proven beyond a reasonable doubt" (emphasis added) (405 Ill. App. 3d at 172), had an explicit finding of all of the requirements for commitment required under *Masterson* been required.

Under *Masterson*, evidence, however great, of "impaired volitional capacity" (405 Ill. App. 3d at 171) is not enough. *Masterson* expressly requires, in addition, "an explicit finding that it is 'substantially probable' the person subject to the commitment proceeding *will* engage in the commission of sex offenses in the future if not confined." (Emphasis added.) *Masterson*, 207 Ill. 2d at 330, 798 N.E.2d at 749. The trial court failed to make the explicit findings required under *Masterson*. The trial court's order is not valid under the Act as interpreted in *Masterson*. I would reverse that order and remand for new proceedings consistent with the requirements under the Act as defined by our supreme court.

Accordingly, I respectfully dissent from the majority judgment affirming the trial court's orders.