NOTICE

Decision filed 02/23/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 230086-U

NO. 5-23-0086

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Macon County. |
| | ) | |
| v. | ) | No. 06-CF-659 |
| | ) | |
| DOMENIC E. FULLERTON, | ) | Honorable |
| | ) | Thomas E. Griffith Jr., |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BOIE delivered the judgment of the court.
Justices Moore and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held:* The trial court's finding that the respondent remained a sexually dangerous person under the Sexually Dangerous Persons Act was not against the manifest weight of the evidence.

¶ 2    In 2008, the respondent, Domenic E. Fullerton, was adjudicated a sexually dangerous person under the Sexually Dangerous Persons Act (SDP Act) (725 ILCS 205/0.01 *et seq.* (West 2008)), and the trial court committed him to the custody of the Illinois Department of Corrections (IDOC), until such time as he was no longer a sexually dangerous person. On May 21, 2021, the respondent filed an application for discharge or conditional release pursuant to section 9(a) of the SDP Act, alleging that he had recovered and was no longer a sexually dangerous person. *Id.* § 9(a). Following a bench trial, the trial court entered a written order finding that the respondent remained sexually dangerous and denying his application. The respondent appeals, arguing that the trial

1

court erred in denying his application for conditional release because he has made dramatic improvement in his treatment, and that the trial court's findings and denial of his application was against the manifest weight of the evidence. For the following reasons, we affirm the judgment of the trial court.

¶ 3                              I. FACTS

¶ 4      On May 9, 2006, the respondent was charged by information with two counts of predatory criminal sexual assault of a child against J.G., a minor under the age of 13. 720 ILCS 5/12-14.1 (West 2006). On August 10, 2006, the State filed a petition to declare the respondent a sexually dangerous person pursuant to the SDP Act (725 ILCS 205/0.01 *et seq* (West 2006)). On April 25, 2008, after a stipulated bench trial, the trial court found the respondent to be a sexually dangerous person and committed the respondent to the custody of the IDOC.

¶ 5      On May 21, 2021, the respondent filed a *pro se* application for discharge or conditional release pursuant to section 9(a) of the SDP Act (*id.* § 9(a)), alleging that he had recovered and was no longer a sexually dangerous person. The respondent alleged that, for the reasons detailed in his application, the penultimate step in his pursuit of recovery would be a period of conditional release, with conditions and risk prevention measures in place. The respondent further alleged that he had a safe and adequate release plan in place that would serve the dual objective of providing essential protection to the public, and allowing the necessary liberty to establish that he was fully recovered. The respondent requested that the trial court grant him conditional release from commitment. The trial court appointed counsel to represent the respondent.

¶ 6      On August 25, 2021, the Attorney General of the State of Illinois entered its appearance on behalf of the acting director of the IDOC. On November 8, 2021, the trial court ordered the IDOC to appoint an evaluator and file a statutorily mandated socio-psychiatric evaluation report on the

respondent. See *id.* § 9(a). On March 31, 2022, the IDOC filed a sexually dangerous persons evaluation report prepared by Dr. Kristopher Clounch, Ph.D., a licensed clinical psychologist and sex offender evaluator. On September 13, 2022, the respondent filed a motion for the appointment of an expert witness, which was denied by the trial court on the same day. Also on the same date, the respondent requested the matter proceed to jury trial and the matter was rescheduled.

¶ 7 The trial court conducted a recovery hearing on the respondent's application on January 24, 2023. Prior to the presentation of testimony, and after the proper admonishments by the trial court, the respondent waived jury trial by written waiver. The State's only witness was Dr. Clounch, and defense counsel stipulated to Dr. Clounch's qualifications and to being an expert in assessing individuals under the SDP Act. Dr. Clounch testified that he was an employee of Wexford Health Services that contracts with the State of Illinois to perform sexually dangerous persons evaluations and that he had performed an in-person evaluation of the respondent on March 16, 2022.

¶ 8 Dr. Clounch testified that the respondent was previously diagnosed with depression and suicidal thoughts. Dr. Clounch had primarily diagnosed the respondent with a pedophilic disorder, sexually attracted to males non-exclusive, which related to his being a sexually dangerous person. Dr. Clounch stated that the respondent's diagnosis indicated that he had sexual behaviors, fantasies and/or urges to engage in sexual conduct with prepubescent children typically under the age of 13. Dr. Clounch indicated that the respondent had shown prior propensity to commit acts of sexual violence or molestation, citing the fact that the respondent had been arrested on two separate occasions for engaging in sexual contact with two young males. The first occasion was in 1988, when he was charged and convicted of criminal sexual assault for engaging in anal sex with a 5-year-old unrelated male, K.H. The

3

second occasion was in 2006, when he was charged with two counts of predatory criminal sexual assault of a child for engaging in oral and anal sex with a 7-year-old unrelated male, J.G.

¶ 9 Dr. Clounch explained that in both of these cases, as well as other offenses that the respondent reported, the respondent displayed grooming behaviors by meeting the families and then either moving in with the family or providing babysitting services, thereby giving him open access to the child, and ultimately, offending upon the child on multiple occasions. Dr. Clounch elaborated on the respondent's uncharged conduct, stating that the respondent had initially indicated he had five victims. However, upon being challenged with his previous report of having 10 victims, the respondent stated that he had peeped on or watched four or five male victims and then there were five contact victims. Two of those contact victims were the ones he was arrested for. The other three incidents were with a 5-year-old male family member, and the respondent sexually penetrated the child on four or five occasions when the respondent was 13 or 14 years old. Further, over a period of one to two years, the respondent sexually offended another male family member when he was between the ages of 7 and 10. Lastly, Dr. Clounch stated that the respondent also sexually offended J.G.'s younger brother while the child was sleeping.

¶ 10 Dr. Clounch further discussed the respondent's victimization of his stepson, which began in 1988 when the respondent met the child's mother. This occurred after the respondent's first criminal sexual assault conviction while he was on probation and in sex offender treatment. The respondent engaged in the relationship and ultimately married the child's mother in 1989. They divorced in 1994, but remarried in the late 1990s or early 2000s,

4

but divorced again in 2003. When the couple met, the child was 5 or 6 years old, and the respondent offended against the child until he turned 10.

¶ 11    Dr. Clounch stated that during the most recent evaluation interview, as well as a previous interview, the respondent reported that he was arrested in 2000 for another offense against the child, but that there was no official record of the offense. When asked whether the respondent hid this relationship and offenses from probation or treatment at the time, Dr. Clounch stated he was unaware and had no records indicating that the respondent disclosed the relationship or his offenses during that time during his treatment or to probation.

¶ 12    Dr. Clounch testified that, in evaluating the respondent, he completed and scored three actuarial assessment measures to determine if the respondent was substantially probable to re-offend. These included the Static-99R, STABLE-2007, and the violence risk scale offender version, known as the VRS-SO.

¶ 13    Dr. Clounch explained that the Static-99R was initially compiled in 1999, and is a 10-item measure addressing primarily static factors that had been found by research to be related to re-offense for male sexual offenders, and is the most widely used measurement in the world for the purposes of actuarial assessment. Dr. Clounch explained that it has a range of scores from negative 3 to 13, and that he scored the respondent at a 2 on the measure. This score would place the respondent in the average category, which would be in the 48.3rd percentile, meaning that 39 of 100 sex offenders would score below the respondent. Dr. Clounch explained that individuals with a similar score of 2 have been found to re-offend at a rate approximately equal to the rate of a typical sex offender.

¶ 14    Dr. Clounch then testified that the STABLE-2007 utilizes 13 dynamic risk factors found to be related to the risk to re-offend for male offenders. According to Dr. Clounch, the factors had

been researched for approximately 15 to 20 years. Using this assessment, the respondent scored 17 out of a possible 26 points, which indicated a high level of stable dynamic risk. The respondent's score of 17 placed him in the 95th percentile, indicating that 95 of 100 sex offenders would score below the respondent.

¶ 15    Dr. Clounch testified that the Static-99R and STABLE-2007 are used in conjunction with one another to provide an overall risk category for the respondent. When combining the respondent's score of 17 on the STABLE-2007, with a Static-99R score of 2, it placed the respondent in the "well-above average category," which was the "highest category we have" for the sex offender risk levels, indicating that individuals in this category re-offend at a rate of 3 to 4 times the rate of the average offender convicted of the sex offenses.

¶ 16    Dr. Clounch then described the third assessment, the VRS-SO, utilized in his evaluation. The VRS-SO is a measure that contains both a static and a dynamic section. Dr. Clounch scored the respondent at a 12 on the static factors and at a 40 on the dynamic factors, for a total of 52 out of a possible 72 in this assessment. This also placed the respondent in the "well-above average" category. This assessment provides both a 5 and a 10 year risk percentage for the individual being re-arrested and/or convicted of a future sex offense. Using the VRS-SO calculator, the respondent's risk to re-offend for five years would be 30.3% and for 10 years would be 43.6%. Dr. Clounch emphasized that this would be a conservative measure of the respondent's actual risk to re-offend. Dr. Clounch explained that research from the rape and incest network using justice bureau statistics had shown that of 1000 sex offenses that occur, approximately only a third are reported to authorities. Therefore, approximately 300 to 350 of those offenses reported, only 60 to 70 result in an actual arrest, meaning approximately only 6 or 7% actually result in the arrest of the offender.

¶ 17    Dr. Clounch stated that, based upon the assessments performed, his expertise, and a reasonable degree of scientific certainty, his opinion was that there was a substantial probability that the respondent would re-offend with a sexual offense if not confined. Dr. Clounch stated that his opinion was based on using the current measures, which are predictive of future offending for male offenders, as well as the respondent's diagnosis of pedophilic disorder and his current lack of progress in his treatment. When asked his opinion about whether the respondent remained a sexually dangerous person, Dr. Clounch opined, based on a reasonable degree of scientific certainty, that the respondent remained a sexually dangerous person.

¶ 18    Dr. Clounch was then questioned about whether the respondent had any protective factors regarding his risk of re-offending. In response, Dr. Clounch acknowledged that there were three protective factors he considered regarding the respondent. The three protective risk factors included an individual's advanced age and/or health decline, an individual's being in the community for an extended period of time without re-offending, and whether the individual made either significant progress and/or completed a sex offender treatment program. Dr. Clounch testified that only one factor applied to the respondent, stating that the respondent was between 40 and 60 years old, which results in a one-point reduction in his Static-99R score. However, Dr. Clounch stated that this did not change his opinion that the respondent was still substantially probable to re-offend.

¶ 19    Dr. Clounch acknowledged that the respondent had been in treatment while housed in the IDOC and had made progress in his treatment. According to Dr. Clounch, the respondent participated in approximately 69% of the group sessions that he attended. The respondent had attended three separate groups since 2014; however, he attended two of those groups in 2017 and was removed from those groups for missing three or more sessions. The third group session the

7

respondent participated in was a therapy group, which is considered the primary group that offenders participate in.

¶ 20    Dr. Clounch was advised by the respondent's prior therapist and his current program director that he adequately participated in, and regularly attended, those group sessions. When Dr. Clounch inquired regarding the respondent's ability to recognize his cognitive distortions, he was informed that the respondent typically required others to point out his cognitive distortions and thinking errors, and he did not appear to be challenging those in the moment or during the group sessions. Further, when Dr. Clounch inquired about the respondent's addressing of his sexual deviance during the group sessions, he was informed that the only evidence that the respondent was addressing the issue was at the end of 2021, when the respondent repeatedly requested to be placed on a different wing at the IDOC facility so that he could be closer to a specific sexually dangerous person of whom he was sexually attracted to and or possibly had a prior relationship with.

¶ 21    According to Dr. Clounch, it was clear from that information and the respondent's treatment groups that he had significant difficulty with recognizing his cognitive distortions, challenging those distortions, and then ultimately recognizing his sexual deviance and addressing that during his group sessions. Dr. Clounch then stated that there was a concern regarding the respondent's relationship with another sexually dangerous person since he was still in treatment but continued to, or attempted to, engage in a sexually deviant relationship in the facility. Dr. Clounch explained that, although the relationship would be appropriate if they were in the community, since they were still housed in the facility, such a relationship was considered a deviant relationship and not allowed. Dr. Clounch stated that this relationship was similar to the

8

respondent's prior experience in the community when he was in treatment but was offending on a young child during that time.

¶ 22    Regarding the respondent's plans if he were to be released into the community, Dr. Clounch testified that he spoke with the respondent regarding his plans but had concerns. According to Dr. Clounch, when asked who he most wanted to see when released, the respondent stated his mother, his son, and his grandson who was 10 years old. Dr. Clounch was concerned with the respondent's wanting to have a relationship with his grandson because the child would fit the respondent's victim profile since he had offended against both related and unrelated victims. Dr. Clounch's March 31, 2022, evaluation report was admitted into evidence without objection.

¶ 23    On cross-examination, Dr. Clounch acknowledged that the respondent had two prior arrests for sexual offenses, the first resulting in a probation sentence and the second resulting in being committed as a sexually dangerous person. Dr. Clounch stated that during his interview and during therapy, the respondent disclosed other offenses for which he was never arrested or prosecuted. Dr. Clounch then agreed that one of the purposes of therapy and speaking with any specialist was to try to make sure a full and honest picture of what the respondent's background looked like.

¶ 24    When questioned regarding the respondent's progress, Dr. Clounch agreed that prior to 2017, the respondent was engaged in three groups until he was removed from two of the groups. Further, the respondent continued his therapy except for two times when he signed himself out of treatment. Dr. Clounch stated that since that time, the respondent was regularly attending and participating in his therapy. At that time, the only therapy available to the respondent was group therapy sessions since there was only one therapist available to provide services.

¶ 25    Defense counsel referenced the respondent's prior treatment plan from 2019, noting that at that time, the respondent was considered to be in Phase 1, and that the Phase program had been

discontinued. Dr. Clounch stated that since December 2019, there probably had been some progress. However, there had been continued difficulties primarily with the respondent's ability to recognize and challenge his distorted thinking, as he had several incidences of attempted deviant behavior and was unwilling to admit to those incidents during treatment and acknowledge that there is a sexual motivation for some of his behaviors. As examples, Dr. Clounch referenced that, at the end of 2021, the respondent purchased shoes for another sexually dangerous person and requested to purchase books that depicted stories of child sexual abuse. According to Dr. Clounch, this showed the respondent's continued display of his sexually deviant behavior and interest. Dr. Clounch was questioned regarding the respondent's relationships or sexual attraction with other individuals in the IDOC facility. Dr. Clounch indicated that part of the issue with this was that the individuals were all located within the facility, but also because, although over the age of 18, many of the individuals the respondent was interested in were the younger looking and acting individuals in the facility and more similar to the respondent's victim profile.

¶ 26 Dr. Clounch agreed that while in treatment since 2018, the respondent started to show concern in his therapy groups about victims and how victims handle their abuse, thereby recognizing the role he played in the abuse. Further, the respondent asked questions regarding how a person knows if they are still in their cycle. Accordingly, Dr. Clounch agreed that the respondent was exploring the background for why he did what he did. Also, Dr. Clounch acknowledged that even though his evaluation report stated that it was important for the respondent to participate more fully in his treatment to get a better understanding of his offending process and bolster his coping skills and interventions to reduce his risk to re-offend sexually, at that time, the respondent was being offered the just one group session per week.

¶ 27     Dr. Clounch was then questioned regarding the respondent's scores of 2 on the Static-99R and 17 on the STABLE-2007, and if those were objective measures or if there was some subjective aspect to them. Dr. Clounch responded that the measure for the Static-99R comes primarily from the respondent's records and his own reporting, while there is a more subjective understanding for the STABLE-2007. Dr. Clounch acknowledged that he was unaware that the respondent had been placed on A grade minimum security since 2015. Regarding the VRS-SO assessment, Dr. Clounch stated that the respondent showed a 30% chance of being re-arrested or re-convicted, not necessarily re-offending, within five years.

¶ 28     Dr. Clounch agreed that one of his concerns with the respondent's conditional release was his interest in establishing a relationship with his grandson. Dr. Clounch disagreed with defense counsel's assertion that the IDOC would maintain control over the respondent if released. Dr. Clounch stated that if released, the respondent would have stipulations set by the IDOC and have an electronic monitor; however, there would not be someone with the respondent all of the time to make sure he would not be re-offending. Dr. Clounch did agree that if the respondent were to be released, the court would have to approve a conditional release plan that would include restricting where the respondent lived, worked, and how far he could go on the electronic monitor. Further, if released, the respondent would be required to attend treatment in the community, perhaps for more than one hour per week.

¶ 29     On re-direct examination, Dr. Clounch testified that the respondent's being placed on A grade minimum security would not have affected his opinion regarding the respondent. Further, Dr. Clounch had never considered the respondent's security level in any of his evaluations because that was "a totally separate issue."

¶ 30    The trial court referenced the respondent's most recent semiannual program evaluation for the period of July 2019 through December 2019, where the respondent was noted to be in Phase 1 of the treatment program. Dr. Clounch acknowledged that information was included in his evaluation report. The trial court stated that the program evaluation indicated numerous different areas that the respondent needed, either some improvement, a considerable need for improvement, or a very, very considerable need for improvement. The trial court asked Dr. Clounch what the respondent's level of treatment progress was at the current time compared to what it was in December 2019. Dr. Clounch stated that, according to his assessment and the respondent's treatment notes, many of the factors would not change significantly, especially many of the ones that were in very critical need of improvement.

¶ 31    Dr. Clounch specifically explained that when he asked the respondent questions regarding his deviant cycle, the respondent "did not know about that," and that the respondent could only list a few interventions. Dr. Clounch stated that the respondent did not recognize his cognitive distortions and he did not restructure them. Dr. Clounch continued, stating that the respondent was very much at the same sexual deviance level currently as he was in 2019. Further, during the assessment, the respondent did not present an understanding of his core beliefs. Dr. Clounch also stated that, although the respondent could recognize some high-risk factors and triggers, the respondent struggled in group treatment with fully recognizing his high-risk factors and triggers, and is likely placing himself at a higher risk. In support of his opinion, Dr. Clounch referenced the respondent's behaviors of attempting to move to another wing in the facility to be nearer to an individual he was attracted to, purchasing shoes for another sexually dangerous person, and purchasing books with sexually graphic descriptions of the sexual abuse of children.

12

¶ 32 According to Dr. Clounch, when considering many of the factors, especially the ones judging an individual's progress and their ability to be released into the community, the respondent was still displaying problems in those major areas. The trial court then referenced the respondent's learning disability, asking Dr. Clounch if that may have contributed to the fact that the respondent had not made much progress in treatment. Dr. Clounch acknowledged that the learning disability would make it more difficult for an individual to make progress, but that he did not believe it affected the respondent's progress. Dr. Clounch stated that the facility had lower functioning groups and that the respondent could understand much of the material that was presented in the regular group sessions.

¶ 33 At the conclusion of the testimony and arguments of counsel, the trial court ruled as follows:

"So ***, show then that the Court has considered the pleadings, the sworn testimony, the exhibit and the statements of counsel.

The [respondent's] application for conditional release for discharge is denied. Finding by the Court, the State has proven by clear and convincing evidence that the respondent is still a sexually dangerous person and it is substantially probable the respondent will engage in the commission of sex offenses in the future if not confined.

And counsel, the facts or factors here I deem to be appropriate: [Respondent] is 54 years of age. He's committed at least two sets of very grave offenses against young boys. He has been incarcerated the last 16 or 17 years. I know there were other incidents disclosed; both in the preparation of this report and as part of treatment. The respondent is diagnosed with pedophilia directed towards prepubescent young boys.

13

In terms of treatment progress, and really that's the sticking point; it sounds like at least in using the old categories, he's barely out of stage 1. I think that's due to two factors:

1. The respondent's lack of effort.

And 2. I think COVID has certainly put a damper on things.

And I also state for the record that one group session a week is wholly inadequate, especially when you have people confined for years upon years upon years.

The respondent continues to be high risk on both the Static-99R and the Stable-2007. Regarding the VRS, the respondent is still well above average. And it is Dr. Clounch's opinion—I really have to rely on Doctor Clounch; I'm not an expert in this field—that the respondent continues to be a sexually dangerous person in need of treatment, and in further need of being confined; at least at this time.

I will also state, [respondent], I've said this before, but if you come back here in a couple years and I can see from the report that you're really making a great effort yourself to succeed in treatment, I would probably recommend conditional release at that time. You understand, [respondent]?"

This appeal followed.

¶ 34                                II. ANALYSIS

¶ 35    Under section 9(a) of the SDP Act, a respondent who has been found to be a sexually dangerous person may submit an application to the trial court setting forth facts showing that he has recovered. 725 ILCS 205/9(a) (West 2022). Section 9(a) of the SDP Act states:

"An application in writing setting forth facts showing that the sexually dangerous person or criminal sexual psychopathic person has recovered may be filed before the committing court. Upon receipt thereof, the clerk of the court shall cause a copy

14

of the application to be sent to the Director of the Department of Corrections. The Director shall then cause to be prepared and sent to the court a socio-psychiatric report concerning the applicant. The report shall be prepared by an evaluator licensed under the Sex Offender Evaluation and Treatment Provider Act. The court shall set a date for the hearing upon the application and shall consider the report so prepared under the direction of the Director of the Department of Corrections and any other relevant information submitted by or on behalf of the applicant." *Id.*

¶ 36    Once the respondent files an application, the court must hold a hearing, and the State has the burden of proving by clear and convincing evidence that the respondent remains a sexually dangerous person. *Id.* § 9(b); *People v. Hancock*, 2014 IL App (4th) 131069, ¶ 139. The respondent is a sexually dangerous person if he has (1) a mental disorder existing for at least one year before the petition was filed, (2) criminal propensities to the commission of sex offenses, and (3) demonstrated propensities toward acts of sexual assault or sexual molestation of children. 725 ILCS 205/1.01 (West 2020); *People v. Holmes*, 2016 IL App (1st) 132357, ¶ 103. " '[C]riminal propensities to the commission of sex offenses' means that it is substantially probable that the person subject to the commitment proceedings will engage in the commission of sex offenses in the future if not confined." 725 ILCS 205/4.05 (West 2020).

¶ 37    The respondent argues that the evidence presented at the recovery hearing did not support the trial court's finding that he remained a sexually dangerous person and the denial of the respondent's petition for discharge or conditional release. The trial court's finding that the respondent is still sexually dangerous may not be disturbed on review unless that decision is against the manifest weight of the evidence. *People v. Houde*, 2019 IL App (3d) 180309, ¶ 26. A decision is against the manifest weight of the evidence only if an opposite conclusion is clearly

15

apparent. *Id.* On appeal from a recovery hearing, we must consider all of the evidence introduced at trial in the light most favorable to the State and determine whether any rational trier of fact could have found the essential elements to be proven by clear and convincing evidence. 725 ILCS 205/9(a) (West 2020); *People v. Bailey*, 405 Ill. App. 3d 154, 171 (2010). We also note that the trier of fact is in the best position to weigh the evidence and assess the credibility of the testimony and evidence presented. *Houde*, 2019 IL App (3d) 180309, ¶ 26.

¶ 38    Section 1.01 of the SDP Act defines "sexually dangerous persons" as:

> "All persons suffering from a mental disorder, which mental disorder has existed for a period of not less than one year, immediately prior to the filing of the petition hereinafter provided for, coupled with criminal propensities to the commission of sex offenses, and who have demonstrated propensities toward acts of sexual assault or acts of sexual molestation of children ***." 725 ILCS 205/1.01 (West 2020).

¶ 39    The crux of the respondent's argument is that he has been committed as a sexually dangerous person since 2008. During that entire time, the respondent received treatment and was making progress in his treatment. The respondent contends that Dr. Clounch admitted that the respondent had started to show concern about how some of his victims handled their abuse and was recognizing the role he played in that abuse. Further, the respondent contends that evidence was presented that he could be electronically monitored if he was released and that he would be required to attend treatment. Additionally, the respondent argues that Dr. Clounch discussed the respondent's protective factors that could reduce the risk of his re-offending, including him being sex offense free for a significant period of time, his age, and his completion of a cognitive-behavioral sex offender treatment program. The respondent argues that these are positive steps in the respondent's favor and show a dramatic improvement in his treatment. Accordingly, the

16

respondent argues that the trial court's decision that the respondent remained a sexually dangerous person and denying conditional release was against the manifest weight of the evidence. We disagree.

¶ 40    The sexually dangerous person's evaluation report prepared by Dr. Clounch was admitted into evidence and fully considered by the trial court. In his report, Dr. Clounch extensively set forth the respondent's various mental disorders that have existed for over a year or more, and are accompanied by criminal propensities to the commission of sex offenses. Dr. Clounch testified regarding the statistical testing conducted on the respondent, and that he demonstrated propensities toward acts of sexual assault or molestation of children.

¶ 41    Dr. Clounch testified at length that his expert opinion was that the respondent is substantially probable to re-offend if not confined and explained that the respondent had not lessened his propensity to commit sex offenses through treatment. Dr. Clounch explained his usage of actuarial measures (the Static-99R, STABLE-2007, and VRS-SO), all generally accepted by experts in the field for measuring risk of future offending. All of the actuarial measures indicated that the respondent maintained a high probability of re-offending. Dr. Clounch also testified that he considered the potential protective factors that reduced the respondent's risk to re-offend. Dr. Clounch stated that only one protective factor applied to the respondent and one point was reduced on the Static-99R score due to his age. Dr. Clounch acknowledged his awareness of the protective factors, however, they did not change his opinion that the respondent was still substantially probable to re-offend.

¶ 42    Therefore, we find that the evidence presented by State through Dr. Clounch's testimony and report demonstrated that the respondent remained a sexually dangerous person as defined by the SDP Act and was sufficient for a reasonable fact finder to find by clear and convincing

17

evidence that the respondent remained a sexually dangerous person. After a thorough review, we find nothing in the record that would require us to substitute our judgment for that of the trial court. The trial court was in the best position to evaluate the expert testimony, make credibility determinations, and determine the weight to be given to the evidence and any inferences therefrom. Based on the foregoing, we conclude that the trial court's finding that the respondent remained a sexually dangerous person was not against the manifest weight of the evidence.

¶ 43                          III. CONCLUSION

¶ 44    For the forgoing reasons, the judgment of the circuit court of Macon County is affirmed.

¶ 45    Affirmed.

18